# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

XYNERGY HEALTHCARE CAPITAL II LLC,

      Plaintiff,

        v.

MUNICIPALITY OF SAN JUAN, et al.

      Defendants.

CIVIL NO.: 18-1208 (MEL)

## OPINION AND ORDER

## I.      Procedural Background

Xynergy Healthcare Capital II LLC ("Xynergy") filed an amended complaint against the Municipality of San Juan ("the Municipality" or "MSJ") and GEODATAPR International, Inc. ("Geodata") on August 26, 2018. ECF No. 20. In the amended complaint, Xynergy alleges that Geodata is liable to Xynergy for breach of contract damages under the Healthcare Receivables Master Purchase and Sale Agreement ("Master Agreement"). Id. at 11-12, 15-16. It is also alleged by Xynergy that it has a valid and enforceable security interest over all assets of Geodata. Additionally, Xynergy seeks a declaratory judgment that the Municipality and Geodata are jointly and severally liable for certain unpaid payment obligations under the Master Agreement and Chapter 9 of Title 19, Annotated Laws of Puerto Rico, Section 2211, et. seq. ("the Commercial Transactions Act"). Id. at 11, 15-16.

Geodata answered the complaint and filed a counterclaim on March 25, 2019, seeking declaratory judgment, injunctive relief, and damages for contractual deceit and breach of fiduciary duties. ECF No. 105. Geodata also seeks damages for breach of contract. Id.

Pending before the court is a motion for summary judgment on the complaint filed by Xynergy against Geodata. ECF No. 142. Geodata did not file a timely response in opposition and Xynergy's motion for summary judgment against Geodata was deemed unopposed.[1] ECF No. 165. In the prayer for relief of the motion for summary judgment, Xynergy moves the court to enter a summary judgment:

(1) ordering Geodata to pay to Xynergy, a misdirected payment penalty in the amount of $254,874.80, as agreed in Master Agreement;

(2) ordering Geodata to pay to Xynergy the amount of $367,359.01, for the discount fees accrued on the 17 invoices that it sold, transferred and assigned to Xynergy and later impeded its collection by Xynergy;

(3) ordering Geodata to pay to Xynergy a termination event prepayment penalty in the amount of $132,532.68 for defaulting on the terms of the Master Agreement;

(4) decreeing that Geodata is concurrently liable with the Municipality to pay to Xynergy the amount of $1,019,499.19 in damages for its fraudulent misappropriation of the payment proceeds of the 17 invoices that it sold, transferred and assigned to Xynergy and later collected for itself;

(5) decreeing that under the law, Xynergy has a valid and enforceable security interest over all assets of Geodata, now existing or hereafter arising, wherever located, including and not limited to all of Geodata's receivables from the Municipality;

(6) decreeing that any amount due or to become due by the Municipality to Geodata, is an asset of Xynergy and consequently, the Municipality must pay to Xynergy any amount to be paid by the Municipality for any invoiced amount due to Geodata, until all the amounts owed to Xynergy are paid;

(7) ordering Geodata to pay to Xynergy all attorney's fees and costs incurred by Xynergy in this case;

(8) granting all other further relief that is necessary or proper to effectuate the judgment.

ECF No. 142, at 14-15.

---

[1] Geodata also did not file a timely response in opposition to Xynergy's "Motion Requesting Order to Deem Xynergy's Motion for Summary Judgment Against [Geodata] as Unopposed." See ECF No. 154.

## II.    Standard of Review

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992) (citations omitted). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). For issues where the nonmoving party bears the ultimate burden of proof, the party cannot merely "rely on an absence of competent evidence, but must affirmatively point to specific facts [in the record] that demonstrate the existence of an authentic dispute." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citation omitted). The party need not, however, "rely only on uncontradicted evidence . . . . So long as the [party]'s evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to

determine which version of the facts is most compelling." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original) (citation omitted).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan</u>, 904 F.2d at 115. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood." <u>Greenburg v. P. R. Mar. Shipping Auth.</u>, 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## III.    Uncontested Material Facts[2]

Xynergy is a limited liability company organized under the laws of the state of Florida. ECF No. 142-1, at 1, ¶ 1; ECF No. 142-2, at 1. Mr. Alejandro Nathan ("Mr. Nathan") is the President of Xynergy. ECF No. 142-1, at 1, ¶ 2; ECF No. 142-3, at 1. Geodata is a Puerto Rico domestic corporation. ECF No. 142-1, at 2, ¶ 3; ECF No. 142-4, at 1. Since its inception and up to June 27, 2014, Mr. José R. Rivera Barrera ("Mr. Rivera") was Geodata's President. ECF No. 142-1, at 2, ¶ 4; ECF No. 142-24, at 1, ¶ 2. On June 27, 2014, Mr. Antonio A. Usero Quiñones ("Mr. Usero") became Geodata's President and as of April 26, 2018 was still holding that position. ECF No. 142-1, at 2, ¶¶ 5, 6, 7; ECF No. 142-5, at 2; ECF No. 142-7, at 1-2.[3]

---

[2] Local Rule 56(e) provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."

[3] At some point in time, Mr. Usero became Geodata's Chief Executive Officer. ECF No. 142-1, at 2, ¶ 7; ECF No. 142-7, at 1-2.

In early 2014, Geodata entered into a contract with the Municipality "to perform outsourced services in connection with the medical billing of services provided by the Municipality. Pursuant to those agreements, Geodata would be compensated after billing invoices for the services performed to the Municipality." ECF No. 20, at 3, ¶ 6; ECF No. 105, at 1, ¶ 6. On February 20, 2014, Geodata and Xynergy sent the Municipality a Notice of Perpetual Assignment and Change of Payee ("Notice of Assignment"). ECF No. 142-1, at 2, ¶ 8; ECF No. 142-8, at 1; ECF No. 142-24, at 1, ¶ 5. The Notice of Assignment informed the Municipality that Geodata assigned its present and future accounts receivable to Xynergy and instructed the Municipality to remit all payments for Geodata's accounts receivable to Xynergy until notified otherwise by Xynergy only. ECF No. 142-1, at 3, ¶ 9; ECF No. 142-8, at 1. The Notice of Assignment is in the records of the Municipality under the custody of the Finance Department. ECF No. 142-1, at 3, ¶ 10; ECF No. 142-23, at 2, ¶ 4.

On February 25, 2014, Mr. Usero entered into a Guaranty of Validity in favor of Xynergy. ECF No. 142-1, at 9, ¶ 42; ECF No. 142-12, at 1, ¶ 3. The Guaranty of Validity was sworn and signed by Mr. Usero before public notary Mr. Fermín M. Fracinetti Rivas ("Mr. Francinetti"), who is the Co-President and Co-Chief Executive Officer of Geodata, since April 26, 2018 and its Secretary, since June 27, 2014. ECF No. 142-1, at 10, ¶ 43; ECF No. 142-12, at 3; ECF No. 142-7, at 1-2; ECF No. 142-5, at 1-2.

Also on February 25, 2014, Geodata and Xynergy entered into the Master Agreement. ECF No. 142-1, at 3, ¶ 12; ECF No. 142-10. The purpose of the Master Agreement was for the sale of Geodata's accounts receivable to Xynergy that came from the billing and collection services provided to the Municipality. ECF No. 142-1, at 3, ¶ 13; ECF No. 142-10, at 1; ECF No. 142-24, at 1, ¶ 4. It enabled "Geodata to obtain cash [from Xynergy] in 2 or 3 days for the

services billed to [the Municipality], instead of waiting for payment on the invoices a month or two after billing." ECF No. 142-24, at 2, ¶ 7. In addition to the Master Agreement, Xynergy and Geodata signed a term sheet that set forth several terms applicable to the purchase of Geodata's accounts receivable. ECF No. 142-1, at 3, ¶ 11; ECF No. 142-9, at 1-3.

The payment process set forth in the Master Agreement established that for each account sold Xynergy would pay an initial down payment to Geodata. The initial down payment consisted of the advance rate percentage stated on the term sheet of the net realizable amount of each account. ECF No. 142-1, at 4, ¶ 15; ECF No. 142-10, at 1, ¶ 2(a); ECF No. 142-25, at 4, ¶ 10. The initial down payment was set at 80% of the expected net realizable amount in each of the term sheets agreed to by Geodata. ECF No. 142-1, at 5, ¶ 18; ECF No. 142-9, at 1, ¶ 3; ECF No. 142-14, at 1, ¶ 3; ECF No. 142-16, at 1, ¶ 3; ECF No. 142-25, at 4, ¶ 10. The net realizable amount of an account consisted of 100% of the gross amount that Geodata billed to the Municipality. ECF No. 142-1, at 4, ¶¶ 16-17; ECF No. 142-10, at 2, ¶ 2(e); ECF No. 142-10, at 22. The Master Agreement established that after Xynergy purchased an account from Geodata, all of Geodata's rights, title, and interest in the purchased account automatically vested in Xynergy, which thereby became the sole and absolute owner of the account. ECF No. 142-1, at 4, ¶ 14; ECF No. 142-10, at 2, ¶ 3.1.

After Xynergy paid the initial down payment to Geodata, Xynergy would be entitled to accrue discount fees of 0.1% per day of the net realizable amount of the purchased account until Xynergy received payment of the net realizable amount due on the purchased account from the Municipality. ECF No. 142-1, at 5, ¶¶ 20-21; ECF No. 142-10, at 1; ECF No. 142-25, at 4, ¶ 11. After Xynergy received payment on the purchased account from the Municipality, Xynergy was required to make a second payment to Geodata to complete the purchase price set forth in the

Master Agreement. ECF No. 142-1, at 5, ¶ 19; ECF No. 142-25, at 4, ¶ 10. The second payment consisted of the net realizable amount of the account minus the initial down payment, any deducted expenses, and the discount fees. ECF No. 142-25, at 4, ¶ 10; ECF No. 142-10, at 1, ¶ 2(a).

In the Master Agreement, Geodata represented and warranted to Xynergy that it had all the power and authority necessary to sell its accounts and to convey good and marketable title and ownership of the purchased accounts to Xynergy. ECF No. 142-1, at 6, ¶ 23; ECF No. 142-10, at 7, ¶ 7(a)(i). Geodata also represented and warranted to Xynergy that its execution and performance of the agreement was duly authorized. ECF No. 142-1, at 6, ¶ 24; ECF No. 142-10, at 7, ¶ 7(a)(i)(B); ECF No. 142-24, at 1, ¶ 5. Further, Geodata also represented and warranted to Xynergy that the execution, delivery, and performance of the agreement did not and would not violate any provision of law, regulation or any provision of its organizational documents. ECF No. 142-1, at 6, ¶ 25; ECF No. 142-10, at 7, ¶ 7(a)(iii).

In the Master Agreement, Geodata represented and warranted to Xynergy that it had valid business reasons for selling the purchased accounts rather than obtaining a loan with the accounts as collateral. ECF No. 142-1, at 6-7, ¶ 26; ECF No. 142-10, at 8, ¶ 7(a)(vii). In the Master Agreement, Geodata acknowledged that the Master Agreement was for the purchase and sale of accounts, and that none of these transactions constituted a lending arrangement or a loan. ECF No. 142-1, at 7, ¶ 31; ECF No. 142-10, at 16, ¶ 16(r).

The Master Agreement also contained a provision where Geodata agreed to treat transfers to Xynergy of purchased accounts as a sale for all purposes. ECF No. 142-1, at 7, ¶ 27; ECF No. 142-10, at 10, ¶ 8(d)(i). Further, Geodata agreed pursuant to the Master Agreement to promptly advise all persons and entities who inquire about the ownership of any purchased accounts that

the purchased accounts had been sold to Xynergy. ECF No. 142-1, at 7, ¶ 28; ECF No. 142-10, at 10, ¶ 8(d)(i). Under the Master Agreement, Geodata agreed not to impede or interfere with Xynergy's collection of any purchased accounts. ECF No. 142-1, at 7, ¶ 29; ECF No. 142-10, at 10, ¶ 8(d)(vi). Geodata also agreed not to claim any ownership interest in any purchased account according to the Master Agreement. ECF No. 142-1, at 7, ¶ 30; ECF No. 142-10, at 10, ¶ 8(d)(x). In the Master Agreement, Geodata and Xynergy also agreed to enter into a Wholesale Lockbox Deposit and Account Service Agreement. ECF No. 142-1, at 8, ¶ 33; ECF No. 142-10, at 3-4, ¶ 4.1. As it was notified to the Municipality in the Notice of Assignment, under the Master Agreement, Geodata was required to notify Third Party Obligors of Non-Governmental Accounts that all proceeds paid with respect to the accounts sold to Xynergy, be sent exclusively to Xynergy's lockbox. ECF No. 142-1, at 8, ¶ 34; ECF No. 142-10, at 4, ¶ 4.2(a).

The Master Agreement specifically provides that Xynergy was granted "a first priority security interest in and to the Collateral to secure the Obligations." ECF No. 142-10, at 12, ¶ 9(b). Under the Master Agreement, "Obligations" means "all present and future obligations owing by [Geodata] to [Xynergy] whether arising hereunder or otherwise by [Geodata] to [Xynergy], and whether arising before, during, or after the commencement of any Bankruptcy Event." ECF No. 142-10, at 1, ¶ 2(d). Meanwhile, "Collateral" means

all of [Geodata's] right, title, and interest in, to, and under any and all of the following: (1) the Reserve Account and all payments (if any) due or to become due to [Geodata] from [Xynergy]; (2) all now owned or existing or hereafter acquired accounts receivable of [Geodata] (whether offered for purchase or not, and whether purchased or not), hardware and software pertaining to or related to the Accounts and Purchased including but not limited to all rights to payment under any agreements with Third Party Obligors as defined therein; (3) all records and documents of every kind, including all electronically stored data (other than patient medical records to the extent protected from disclosure by law) and all other information that may assist [Xynergy] in the collection or realization of the Collateral and (4) all of [Geodata's] now owned and hereafter acquired Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, letter

of Credit Rights, Commercial Tort Claims, and General Intangibles, and (5) all
proceeds of the foregoing (all of such terms, as applicable, are presently or hereafter
defined in the Uniform Commercial Code).

ECF No. 142-10, at 12, ¶ 9(a).

Xynergy was authorized under the Master Agreement to file financing statements under
the Uniform Commercial Code ("U.C.C.") naming Xynergy as the secured party and Geodata as
the debtor. ECF No. 142-1, at 8, ¶ 32; ECF No. 142-10, at 9, ¶ 8(a). On February 28, 2014, an
U.C.C. financing statement was filed at the Department of State of Puerto Rico by Xynergy. ECF
No. 142-1, at 10, ¶ 44; ECF No. 142-13, at 1. The financing statement described Geodata as the
debtor and Xynergy as the secured party and it indicated that it covered all assets of the debtor,
now existing and hereafter arising, wherever located and described. ECF No. 142-1, at 10, ¶ 44;
ECF No. 142-13, at 1.

The Master Agreement provided that any payment with respect to an account sold to
Xynergy that was received by Geodata which should have been sent to Xynergy's lockbox
pursuant to the Master Agreement would be deemed a "Misdirected Payment." ECF No. 142-1,
at 8, ¶ 35; ECF No. 142-10, at 5, ¶ 5. If the Misdirected Payment was caused by Geodata, the
Master Agreement stated that Geodata was required to pay to Xynergy a fee of 25% of the
amount of the Misdirected Payment or $1,000.00, whichever was greater. ECF No. 142-1, at 8,
¶ 36; ECF No. 142-10, at 6, ¶ 5(e).

The Master Agreement provided that Xynergy was entitled to indemnification and
recovery of any and all attorney's fees or costs in respect to any litigation based on the Master
Agreement. ECF No. 142-1, at 8-9, ¶ 37; ECF No. 142-10, at 13, ¶ 10. The Master Agreement
also provided that Xynergy was entitled to terminate the agreement immediately and without
notice if Geodata failed to honor any obligation set forth in the agreement which is referred to as

a "Termination Event." ECF No. 142-1, at 9, ¶ 38; ECF No. 142-10, at 13, ¶ 11(c)(iii). Upon the occurrence of a Termination Event, the Master Agreement provided that a "Prepayment Penalty" may be added to any amount owing to Xynergy. Id. Under the Master Agreement, the "Prepayment Penalty" means the amount that Xynergy would have received as discount fees over the next six months based on the average of all discount fees for the preceding six months. ECF No. 142-1, at 9, ¶ 39; ECF No. 142-10, at 13, ¶ 11(b).[4]

After the Municipality received the Notice of Assignment, from the year 2014 and up to June 30, 2018, in relation to the services rendered by Geodata to the Municipality, the Municipality paid to the order of both Geodata and Xynergy, the amount of $18,668,682.62. ECF No. 142-1, at 10-11, ¶ 46; ECF No. 142-20, at 7-8, ¶ 5; ECF No. 142-25, at 6, ¶ 13.

Between March 7, 2017 through March 6, 2018, Geodata, sold 17 invoices (hereinafter "Disputed Invoices"), for services rendered by Geodata to the Municipality, to Xynergy which remain unpaid to Xynergy. The Disputed Invoices are not part of the $18,668,682.62 amount that the Municipality paid to both Geodata and Xynergy. ECF No. 142-1, at 11, ¶ 47; ECF No. 142-25, at 6-15, ¶¶ 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44. The aggregate amount of the Disputed Invoices that Geodata sold to Xynergy is $1,019,499.19 and are the following:

1. Invoice No. 002-2017 Cont. February 2017, dated March 7, 2017, requesting payment from the Municipality in the amount of $341,996.51. ECF No. 142-25, at 14, ¶ 44; ECF No. 142-41, at 1-3.

2. Invoice No. 2017-013, dated July 24, 2017, requesting payment from the Municipality in the amount of $39,166.04. ECF No. 142-25, at 6, ¶ 14; ECF No. 142-26, at 1-2.

---

[4] On June 25, 2014, a Guaranty of Validity in favor of Xynergy was sworn and signed before a public notary by Ms. Janet Martínez ("Ms. Martínez"), as an official and stockholder of Geodata. ECF No. 142-1, at 10, ¶ 45; ECF No. 142-15, at 3; ECF No. 142-5, at 1. Through that Guaranty of Validity, Ms. Martínez authorized Xynergy to extend a factoring relationship to Geodata, pursuant to the terms and conditions of the Master Agreement. ECF No. 142-1, at 10, ¶ 45; ECF No. 142-15, at 1, ¶ 2.

3. Invoice No. 2017-014, dated August 7, 2017, requesting payment from the Municipality in the amount of $39,008.55. ECF No. 142-25, at 6-7, ¶ 16; ECF No. 145-1, at 1; ECF No. 145-2, at 1-3.

4. Invoice No. 2017-015, dated August 20, 2017, requesting payment from the Municipality in the amount of $46,116.94. ECF No. 142-25, at 7, ¶ 18; ECF No. 142-28, at 1-2.

5. Invoice No. 2017-016, dated September 3, 2017, requesting payment from the Municipality in the amount of $40,536.64. ECF No. 142-25, at 8, ¶ 20; ECF No. 142-29, at 1-2.

6. Invoice No. 2017-017, dated October 4, 2017, requesting payment from the Municipality in the amount of $37,258.29. ECF No. 142-25, at 8, ¶ 22; ECF No. 142-30, at 1-2.

7. Invoice 2017-018, dated October 4, 2017, requesting payment from the Municipality in the amount of $27,985.31. ECF No. 142-25, at 8, ¶ 22; ECF No. 142-30, at 1, 5.

8. Invoice No. 2017-019, dated October 18, 2017, requesting payment from the Municipality in the amount of $42,478.54. ECF No. 142-25, at 9, ¶ 24; ECF No. 142-31, at 1-2.

9. Invoice No. 2017-020, dated November 1, 2017, requesting payment from the Municipality in the amount of $45,282.74. ECF No. 142-25, at 9, ¶ 26; ECF No. 142-32, at 1-2.

10. Invoice No. 2017-021, dated November 16, 2017, requesting payment from the Municipality in the amount of $49,161.97. ECF No. 142-25, at 10, ¶ 28; ECF No. 142-33, at 1-2.

11. Invoice No. 2017-022, dated December 1, 2017, requesting payment from the Municipality in the amount of $40,722.26. ECF No. 142-25, at 10-11, ¶ 30; ECF No. 142-34, at 1-2.

12. Invoice No. 2017-023, dated December 18, 2017, requesting payment from the Municipality in the amount of $48,250.05. ECF No. 142-25, at 11, ¶ 32; ECF No. 142-35, at 1-2.

13. Invoice No. 2017-024, dated January 2, 2018, requesting payment from the Municipality in the amount of $40,654.82. ECF No. 142-25, at 12, ¶ 34; ECF No. 142-36, at 1-2.

14. Invoice No. 2018-001, January 18, 2018, requesting payment from the Municipality in the amount of $38,069.73. ECF No. 142-25, at 12, ¶ 36; ECF No. 142-37, at 1-2.

15. Invoice No. 2018-002, dated February 2, 2018, requesting payment from the Municipality in the amount of $54,900.61. ECF No. 142-25, at 13, ¶ 38; ECF No. 142-38, at 1-2.

16. Invoice No. 2018-003, dated February 16, 2018, requesting payment from the Municipality in the amount of $47,967.10. ECF No. 142-25, at 13, ¶ 40; ECF No. 142-39, at 1-2.

17. Invoice No. 2018-004, dated March 1, 2018, requesting payment from the Municipality in the amount of $39,943.09. ECF No. 142-25, at 14, ¶ 42; ECF No. 142-40, at 1-2.

ECF No. 142-1, at 11-14, ¶ 48. In relation to the Disputed Invoices described above, Xynergy paid to Geodata the aggregate amount of $815,119.35 via wire transfer to Geodata's bank account.[5] ECF No. 142-1, at 13, ¶ 49; ECF No. 142-25, at 6-15. As of October 8, 2019, Xynergy has not received payment from the Municipality or any other entity on the amounts due on the Disputed Invoices. ECF No. 142-1, at 14, ¶ 50; ECF No. 142-25, at 15, ¶ 46.

On or around March 28, 2018, through a legal representative, Geodata sent a letter to the Municipality dated March 28, 2018 alleging that the Master Agreement and the assignment of present and future accounts receivables were null and void *ab initio*. ECF No. 142-1, at 15, ¶ 52; ECF No. 142-18. In the letter, Geodata instructed the Municipality to make all payments pursuant to its service agreement with the Municipality, payable only in favor of Geodata. ECF No. 142-1, at 15, ¶ 53; ECF No. 142-18, at 2. Geodata's legal representative sent another letter

---

[5] The Master Agreement set the initial down payment as 80% of the net realizable amount of each purchased account. The aggregate amount of the Disputed Invoices that Geodata sold to Xynergy is $1,019,499.19. Accordingly, 80% of the aggregate amount of the Disputed Invoices is $815,599.35. The court notes the discrepancy in proposed fact 49 that Xynergy paid $815,119.35 as the initial down payments in the aforementioned Disputed Invoices. However, upon closer examination, Xynergy paid wire transfer fees in the aggregate amount of $480.00 on the Disputed Invoices that were deducted from the initial down payments of the purchased accounts. See ECF No. 142-25, at 6-15.

dated April 24, 2018, reiterating the request to make all payments pursuant to its service agreement with the Municipality, payable only in favor of Geodata. ECF No. 142-1, at 15, ¶ 54; ECF No. 142-19. Geodata did not notify Xynergy of the two aforementioned letters. ECF No. 142-1, at 15, ¶ 55; ECF No. 142-25, at 16-17, ¶ 48. After Geodata sent the letter dated March 28, 2018, the Municipality stopped payments of money to the order of both Geodata and Xynergy, and paid to the order of Geodata only, the total amounts due on the Disputed Invoices. ECF No. 142-1, at 15-16, ¶ 56; ECF No. 142-23, at 3-7, ¶¶ 9-10, 16-18, 25.

## IV.     Legal Analysis

Xynergy alleges that Geodata breached the Master Agreement, and thus, it is owed various breach of contract damages. ECF No. 142, at 8. Xynergy also claims that it is entitled to "a tort claim based on that breach of contract" and attorney's fees. Id. at 11, 14. Lastly, Xynergy seeks a declaratory judgment that it is "entitled to the enforcement of all applicable remedies available to a secured party pursuant to Chapter 9 of the Puerto Rico Commercial Transactions Act." Id. at 13.

### A. Whether Geodata Breached the Master Agreement

Xynergy alleges that Geodata breached terms of the Master Agreement and that it is entitled to various breach of contract damages. ECF No. 142, at 8. "Under Puerto Rico law, a claim for breach of contract has three elements: (1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages." Yacht Caribbean Corp. v. Carver Yacht LLC, 270 F. Supp. 3d 547, 555 (D.P.R. 2017). "Puerto Rico law makes clear that contracts shall be binding, regardless of the form in which they were executed, 'provided the essential conditions

required for their validity exist.'" <u>Markel American Ins. Co. v. Díaz-Santiago</u>, 674 F.3d 21, 31

(1st Cir. 2012) (citing 31 L.P.R.A. § 3451).[6]

> Where the terms of a contract are clear, leaving no doubt as to the contracting
> parties' intentions, such contract will be observed according to "the literal sense of
> its stipulations." It is widely accepted that "[o]bligations arising from contracts
> have legal force between the contracting parties, and must be fulfilled in accordance
> with their stipulations."

<u>Id</u>. (citing 31 L.P.R.A. §§ 3471, 2994).

"The Puerto Rico Supreme Court has held that '[w]hen the breach of a contractual

obligation causes harm to any of the contracting parties, an action for damages for breach of

contract lies.'" <u>Redondo Const., Co. v. Izquierdo</u>, 929 F. Supp. 2d 1, 12 (D.P.R. 2012) (quoting

<u>Soc. de Gananciales v. Vélez & Asoc.</u>, 98 P.R. Offic. Trans. 54 (P.R. 1998)); <u>Markel American

Ins. Co.</u>, 674 F.3d at 31 ("Where a party fails to uphold or abide by the contract's essential

obligations, such failure will be deemed a breach of the contract."). "When a party breaches a

contract, it 'is liable to the aggrieved party for damages which were foreseen or may have been

foreseen.'" <u>Redondo Const., Co.</u>, 929 F. Supp. 2d at 12 (quoting <u>Oriental Fin. Group, Inc. v. Fed.

Ins. Co.</u>, 483 F. Supp. 2d 161, 165 (D.P.R. 2007)). Under Puerto Rico law, in pure breach of

contract actions, "remedies are generally limited to the remedies provided in the contract." <u>Id</u>.

(citing <u>P.R. Aqueduct & Sewer Auth. v. Constructora Lluch</u>, 169 F.3d 68, 79 (1st Cir. 1999)).

The first step of the analysis is whether the Master Agreement constitutes a valid

contract. "Under Puerto Rico law, a contract has three elements: consent, a definitive (and legal)

object, and consideration." <u>Citibank Global Markets, Inc. v. Rodríguez Santana</u>, 573 F.3d 17, 24

(1st Cir. 2009) (citing 31 L.P.R.A. § 3391; <u>Quiñones López v. Manzano Pozas</u>, 141 D.P.R. 139,

---

[6] The Revised Puerto Rico Civil Code went into effect on November 28, 2020. <u>See</u> Revised Puerto Rico Civil Code,
Article 1820 of PR Act 55 of June 1, 2020, at p. 388-89. Citations to the Puerto Rico Civil Code refer to the
statutory provisions of said Code that were in effect at the time of the events giving rise to this litigation.

1996 P.R.–Eng. 499244 (P.R. 1996)). In the case at bar, the Master Agreement is a legally

binding contract between Xynergy and Geodata. See ECF No. 142-10. The Master Agreement

was signed by Mr. Nathan, Xynergy's president, and Mr. Rivera, Geodata's president, which

shows consent by the parties to be bound to the terms of the Master Agreement. ECF No. 142-

10, at 17. See TC Investments Corp. v. Becker, 733 F. Supp. 2d 287, 296 (D.P.R. 2010)

("Consent is shown by the concurrence of the offer and acceptance of the thing and the cause

which are to constitute the contract."). The definitive object of the Master Agreement was for the

sale of Geodata's accounts receivable to Xynergy that came from the billing and collection

services provided to the Municipality. ECF No. 142-1, at 3-4, ¶ 13; ECF No. 142-10, at 1; ECF

No. 142-24, at 1, ¶ 4. In exchange for the accounts receivable, Geodata received monetary

payment from Xynergy. Id. Thus, the Master Agreement constitutes a valid contract between

Xynergy and Geodata. The next step of the inquiry is analyzing whether Geodata breached the

terms of the Master Agreement, and if so, determine the resulting damages.

**1. Whether Xynergy is Entitled to a Misdirected Payment Penalty from Geodata**

Xynergy alleges that Geodata breached the Master Agreement when it directed the

Municipality to pay the amounts due on the Disputed Invoices exclusively to Geodata. ECF No.

142, at 8-9. Thus, Xynergy argues it is entitled to a Misdirected Payment Penalty. Id.

The Master Agreement provided that any payment with respect to an account sold to

Xynergy that was received by Geodata which should have been sent to Xynergy's lockbox

pursuant to the Master Agreement would be deemed a "Misdirected Payment." ECF No. 142-1,

at 8, ¶ 35; ECF No. 142-10, at 5, ¶ 5. Under the Master Agreement, Geodata was required to

notify Third-Party Obligors that all proceeds paid with respect to all Non-Governmental

Accounts be sent exclusively to Xynergy's lockbox. ECF No. 142-10, at 4, ¶ 4.2(a). The

Disputed Invoices at issue were Non-Governmental Accounts. The Master Agreement provides

> Accounts for which the Third Party Obligor is the United States of America or any state or any agency or Instrumentality thereof or any state which is obligated to make any payments with respect to Medicare or Medicaid Accounts or representing amounts owing under any other program established by a federal or state law which provides for payments for healthcare goods or services to be made to the Provider are hereinafter referred to as "Governmental Accounts"; all other Accounts are sometimes hereinafter referred to as "Non-Governmental Accounts."

ECF No. 142-10, at 1, ¶ 1.

The accounts receivable that Xynergy purchased from Geodata were the invoices for the

medical billing and collection services that Geodata provided to the Municipality. See ECF No.

142-24, at 1, ¶¶ 3-4; ECF No. 142-10, at 1, ¶ 1. Xynergy was not buying the Medicare or

Medicaid Accounts or amounts owed to Geodata under a program established by a federal or

state law. Therefore, the accounts receivable at issue in this case were Non-Governmental

Accounts, and Geodata was required to notify the Municipality that all proceeds paid with

respect to these accounts be sent exclusively to Xynergy's lockbox. See ECF No. 142-10, at 4,

¶ 4.2(a).

Geodata initially complied with its obligations under the Master Agreement by notifying

the Municipality via the Notice of Assignment on February 20, 2014 that Geodata had assigned

its present and future accounts receivable to Xynergy. ECF No. 142-8. The Notice of

Assignment instructed the Municipality to remit all payments for Geodata's accounts receivable

to Xynergy until notified otherwise by Xynergy only. Id. However, Geodata sent a letter to the

Municipality dated March 28, 2018 which stated that the Master Agreement and the assignment

of present and future accounts receivable was null and void *ab initio* and instructed the

Municipality to make all payments pursuant to its service agreement with the Municipality,

payable only in favor of Geodata. ECF No. 142-18. Geodata reiterated the request in a second letter dated April 24, 2018. ECF No. 142-19. As a result of Geodata's letters, the Municipality discontinued payments of money to the order of both Geodata and Xynergy in relation to the services rendered by Geodata to the Municipality. ECF No. 142-20, at 8-9, ¶ 6-7; ECF No. 142-23, at 3-7, ¶ 9-10, 16-18, 25. The Municipality made payments to Geodata only with regard to the Disputed Invoices. ECF No. 142-23, at 5-7, ¶¶ 16, 25.

The Master Agreement provided that if Geodata caused the Misdirected Payment then Geodata was required to pay to Xynergy a fee of 25% of the amount of the Misdirected Payment or $1,000.00, whichever was greater. ECF No. 142-10, at 6, ¶ 5(e). Here, Geodata caused Misdirected Payments for the Disputed Invoices by sending letters to the Municipality instructing it to make all payments payable only in favor of Geodata when they should have been paid to Xynergy. ECF No. 142-20, at 8-9, ¶ 6-7; ECF No. 142-23, at 3-7, ¶ 9-10, 16-18, 25.

Therefore, under the Master Agreement, Geodata owes to Xynergy a Misdirected Payment Penalty in the amount of $254,874.80, which constitutes 25% of the amount of the misdirected payments on the Disputed Invoices. ECF No. 142-1, at 16-17, ¶ 59; ECF No. 142-25, at 17-18, ¶ 50.

### 2. Whether Xynergy is Entitled to a Prepayment Penalty from Geodata

Xynergy alleges that Geodata failed to honor several obligations in the Master Agreement, thus triggering a Termination Event and permitting Xynergy to recover a Prepayment Penalty. The Master Agreement provided that Xynergy may terminate the agreement immediately and without notice upon the occurrence of a Termination Event. ECF No. 142-10, at 13, ¶ 11(c). As stated earlier, a Termination Event occurs upon Geodata's failure to honor any obligation set forth in the Master Agreement. Id. The Master Agreement also provided that "[i]n

17

the event of a Termination Event, the Prepayment Penalty may be added to the amounts owing to Xynergy hereunder." Id. Under the Master Agreement, Geodata agreed not to impede or interfere with Xynergy's collection of any purchased accounts and not to claim any ownership interest in any purchased account. ECF No. 142-1, at 7, ¶¶ 29, 30; ECF No. 142-10, at 10, ¶¶ 8(d)(vi), (x). Additionally, the Master Agreement stated that in the event that Geodata received a Misdirected Payment, Geodata was obligated to immediately deposit the payment in Xynergy's lockbox. ECF No. 142-10, at 5, ¶ 5(a).

As stated previously, Geodata sent two letters to the Municipality declaring that the Master Agreement was null and void and instructing it to make payments only in favor of Geodata. ECF No. 142-18; ECF No. 142-19. As a result, the Municipality discontinued payments of money to the order of both Geodata and Xynergy, and instead, made payments to the order of Geodata only with regard to the Disputed Invoices. ECF No. 142-23, at 5, 7; ECF No. 142-20, at 8-9, ¶ 6-7.

By sending these letters to the Municipality, Geodata breached its obligation under the Master Agreement not to impede or interfere with Xynergy's collection of any purchased accounts and not to claim any ownership interest in any purchased account. See ECF No. 142-10, at 10, ¶ 8(d)(x); ECF No. 142-10, at 10, ¶ 8(d)(vi). Geodata also breached its obligations when it received and retained payments for the Disputed Invoices from the Municipality that it was required to immediately deposit in Xynergy's lockbox. See ECF No. 142-23, at 3-7, ¶¶ 9-10, 16-18, 25; ECF No. 142-10, at 5, ¶ 5(a). Therefore, Geodata's breach of its obligations under the Master Event constitutes a Termination Event.

The Prepayment Penalty is calculated considering the amount that Xynergy would have received as discount fees over the next six months after the Termination Event based on the

average of all discount fees for the preceding six months. ECF No. 142-10, at 14, ¶ 11(b). The average discount fees that were received by Xynergy from October 1, 2017 through March 31, 2018 was $736.29 daily. ECF No. 142-25, at 18, ¶ 52. Because Geodata breached its obligations under the Master Agreement, Xynergy is entitled to the payment of a Prepayment Penalty from Geodata in the amount of $132,532.68.[7] ECF No. 142-25, at 18, at ¶ 51.

### B. Xynergy's Alleged Tort Claim

It is also alleged by Xynergy that "Geodata's actions constituted both a breach of contract and a breach of duty, therefore, Xynergy as the damaged party, it is entitled to a tort claim based on that breach of contract." ECF No. 142, at 11. Specifically, Xynergy claims that "Geodata is also concurrently liable with [the Municipality] to pay to Xynergy, the amount of $1,019,499.19 in damages because it fraudulently appropriated money that belonged to Xynergy under the [Master Agreement] and [Notice of Assignment]." Id.

Under Article 1802, the general tort statute in Puerto Rico, "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31 L.P.R.A. § 5141. Puerto Rico's general tort statute "generally does not apply in the context of commercial transactions." Linares-Acevedo v. Acevedo, 38 F. Supp. 3d 222, 228 (D.P.R. 2014) (citing Isla Nena Air Servs., Inc. v. Cessna Aircraft Co., 449 F.3d 85, 88 (1st Cir. 2006)). However,

> [a] plaintiff may bring a negligence claim based on a contractual relationship when there is both an alleged breach of contract and an alleged breach of the general duty not to negligently cause injury. This general duty not to act negligently must arise out of conditions separate from the parties' contract. If a plaintiff's damages arise exclusively from a defendant's alleged breach of contract, the plaintiff does not have a separate cause of action for negligence.

---

[7] The Prepayment Penalty is calculated by multiplying $736.29 (the average of all discount fees for the preceding six months) by 180 days (six months), yielding a total of $132,532.20. ECF No. 142-10, at 14, ¶ 11(b); ECF No. 142-25, at 18, ¶ 51.

Nieves Domenech v. Dymax Corp., 952 F. Supp. 57, 65–66 (D.P.R. 1996) (citations omitted);

CPC Carolina PR, LLC v. Puerto Rico CVS Pharmacy, LLC, Civ. No. 18-1555, 2020 WL

583476, at *9-10 (D.P.R. Sept. 30, 2020); Burk v. Paulen, 100 F. Supp. 3d 126, 136 (D.P.R.

2015).

In the case at hand, Xynergy's alleged Article 1802 damages arise directly out of

Geodata's breach of the Master Agreement. Xynergy's alleged entitlement to $1,019,499.19

would not have occurred apart from the Master Agreement between Geodata and Xynergy. See

Isla Nena Air Servs., Inc., 449 F.3d at 91; Linares-Acevedo, 38 F. Supp. 3d at 228 (explaining

that because the "alleged breach of duty of care is intertwined with the alleged breach of

contract, plaintiffs cannot bring a separate cause of action under Article 1802, and the claim must

be dismissed."). Xynergy has not set forth adequate argumentation explaining the separate duty

of care that it was owed by Geodata that was independent from the Master Agreement. See

Nieves Domenech, 952 F. Supp. at 65–66. Therefore, Xynergy's Article 1802 claim is

DISMISSED WITH PREJUDICE. See CPC Carolina PR, LLC, 2020 WL 583476, at *9-10.

### C. Whether Xynergy is Entitled to the Repurchase Price of the Disputed Invoices

While Xynergy cannot recover the $1,019,499.19 under a tort theory, it may still recover

a portion of that amount under breach of contract because the Disputed Invoices are Ineligible

Accounts under the Master Agreement. The Master Agreement provides that

> A Purchased Account shall be or immediately become an "Ineligible Account" if
> one of the following has occurred: (i) there has been a breach of any representation
> or warranty contained herein relating to such Purchased Account; (ii) XYN2[8] has
> not received collections with respect to such Purchased Account in an amount at
> least equal to the Target Amount for such Purchased Account within 120 days from
> the date of service relating to such Purchased Account (for any reason other than as
> a result of the bankruptcy or insolvency or receivership of the applicable Third
> Party Obligor), or (iii) XYN2 reasonably has determined prior to the end of such
> 120 day period (other than a result of the bankruptcy or insolvency or receivership,

---

[8] "XYN2" refers to Xynergy under the Master Agreement. See ECF No. 142-10, at 1.

or anticipated bankruptcy or insolvency or receivership, of the applicable Third Party Obligor) that such Third Party Obligor will not pay, by the end of such 120 day period, an amount on such Purchased Account equal to not less than the Target Amount for such Purchased Account.

ECF No. 142-10, at 6, ¶ 6. The Master Agreement also provides that "[t]he Provider[9] shall cure such breach or repurchase each such Ineligible Account from XYN2 at a price equal to the Repurchase Price within five (5) business days of the earlier of notification to, or discovery by, the Provider or XYN2 of the breach or failure of XYN2 to receive payment of the Target Amount as described above." ECF No. 142-10, at 6, ¶ 6. The "'Repurchase Price' for an Ineligible Account (a 'Repurchased Account') shall be equal to (i) the sum of the Initial Down Payment for such Account plus the amount of XYN2's discount fees for such Account accrued through the date of Provider's repurchase of such Account, less (ii) any amount collected by XYN2 with respect to such Ineligible Account." ECF No. 142-10, at 6, ¶ 6.

In the case at hand, the Disputed Invoices are Ineligible Accounts under the Master Agreement because Xynergy has "not received collections with respect to such Purchased Account[s] in an amount at least equal to the Target Amount for such Purchased Account[s] within 120 days from the date of service relating to such Purchased Account[s] (for any reason other than as a result of the bankruptcy or insolvency or receivership of the applicable Third Party Obligor)." ECF No. 142-10, at 6, ¶ 6. The record reflects that in relation to the Disputed Invoices, Xynergy paid to Geodata the aggregate amount of $815,119.35 as the initial down payment for the Disputed Invoices via wire transfer to Geodata's bank account. ECF No. 142-1, at 13, ¶ 49; ECF No. 142-25, at 6-15. The wire transfers for the Disputed Accounts occurred between March 8, 2017 and March 6, 2018. See ECF No. 146-25, at 6-15, ¶¶ 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45. As of October 8, 2019, Xynergy has not received

---

[9] "Provider" refers to Geodata under the Master Agreement. See ECF No. 142-10, at 1.

payment from the Municipality or any other entity on the amounts due on the Disputed Invoices. ECF No. 142-1, at 14, ¶ 50; ECF No. 142-25, at 15, ¶ 46. Therefore, the Disputed Invoices are Ineligible Accounts because more than 120 days have passed since Xynergy made the initial down payments on the Disputed Invoices and Xynergy has not received payment on the Disputed Invoices.[10]

Because the Disputed Invoices are Ineligible Accounts and Geodata had notice that the amounts due on the Disputed Invoices were not paid to Xynergy, Geodata is required to repurchase the Disputed Invoices from Xynergy for the Repurchase Price. The Repurchase Price for the Disputed Invoices is $815,119.35 (the sum of the initial down payments for the Disputed Invoices) plus the amount of Xynergy's discount fees for the Disputes Invoices through the date of Geodata's repurchase of the accounts, less any amount already collected by Xynergy on the Disputed Invoices.[11] ECF No. 142-10, at 6, ¶ 6; ECF No. 142-25, at 6-15. Because the Disputed Invoices are Ineligible Accounts, Xynergy is entitled to the payment of the Repurchase Price of the Disputed Invoices from Geodata in the amount of $815,119.35 plus the amount of Xynergy's discount fees for the Disputed Invoices through the date of Geodata's repurchase of the Disputed Invoices.[12]

### D. Whether Xynergy is Entitled to Attorney's Fees

Xynergy alleges that it is entitled to attorney's fees and costs under the Master Agreement. ECF No. 142, at 14. The Master Agreement provides that "[Geodata] agrees that [Xynergy] shall be entitled to indemnification and recovery of any and all attorney's fees or costs

---

[10] It has not been brought to the attention of the court that the Municipality, as the third-party obligor on the Disputed Invoices, has not made payments on the Disputed Invoices as a result of bankruptcy or insolvency or receivership.

[11] As stated earlier, as of October 8, 2019, Xynergy has not collected any amounts on the Disputed Invoices. ECF No. 142-1, at 14, ¶ 50; ECF No. 142-25, at 15, ¶ 46.

[12] As of September 10, 2019, Xynergy has accrued discount fees in the total amount of $367,359.01 from the Disputed Invoices. ECF No. 142, at 9; ECF No. 142-25, at 16, ¶ 47.

in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, [the Master Agreement] and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party." ECF No. 142-10, at 13, ¶ 10. This case arose when Geodata breached its obligations under the Master Agreement by interfering with Xynergy's collection of purchased accounts and not immediately depositing the amounts of the Disputed Invoices in Xynergy's Lockbox. See ECF No. 142-10, at 10, ¶ 8(d)(x); ECF No. 142-10, at 10, ¶ 8(d)(vi); ECF No. 142-10, at 5, ¶ 5(a); ECF No. 142-23, at 3-7, ¶¶ 9-10, 16-18, 25.

As of September 10, 2019, Xynergy has incurred in the amount of $91,596.61 in attorney's fees and costs associated with this litigation. ECF No. 142-25, at 19, ¶ 53. Because Xynergy filed this action to enforce its rights under the Master Agreement due to Geodata's interference with Xynergy's collection of purchased accounts, Xynergy is entitled to the payment of attorney's fees and costs associated with this litigation in the amount of $91,596.61. ECF No. 142-25, at 19, ¶ 53. See GE Supply v. C&G Enterprises, Inc., 212 F.3d 14, 19 (1st Cir. 2000) ("attorney's fees 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'") (citations omitted)); Rockland Trust Co. v. Computer Associated Intern., Inc., Civ. No. 95-11683, 2008 WL 3824791, at *3 (D. Mass. Aug. 1, 2008) ("parties who enter a contract may agree that in litigation arising from the contract the successful party's attorney's fees will be paid by the losing party.").

### E. Whether Xynergy has a Security Interest Under Chapter 9 of the Commercial Transactions Act

Xynergy seeks a declaratory judgment that it "is entitled to the enforcement of all applicable remedies available to secured party pursuant to the provisions" of the Commercial Transactions Act. ECF No. 142, at 13-15.

### 1. Declaratory Judgment Standard

"The merits of a declaratory judgment action may be properly asserted by the parties in a motion for summary judgment." Allstate Ins. Co. v. Martinez, Civ. No. 11-574, 2012 WL 1379666, at *4 (D. Conn. Apr. 20, 2012). "In determining a motion for summary judgment that is filed in the context of a declaratory judgment action, the same standard is applied as in any other action." Roe v. City of New York, 232 F. Supp. 2d 240, 252 (S.D.N.Y. 2002); Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 298 F.3d 201, 210 n.12 (3d Cir. 2002) ("The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief"); American Family Mut. Ins. Co. v. Eagle General Contractors, Civ No. 6-993, 2007 WL 3090765, at *1 (D. Colo. Oct. 18, 2007).

"Declaratory judgment claims may properly coexist with breach of contract claims when they provide the plaintiff a form of relief unavailable under the breach of contract claim." Rausnitz v. Transamerica Life Ins. Co., Civ. No. 19-22894, 2019 WL 7643148, at *2 (S.D. Fla. Dec. 13, 2019) (citing Kenneth F. Hackett & Assoc., Inc. v. GE Capital Info. Tech. Solutions, Inc., 744 F. Supp. 2d 1305, 1311 (S.D. Fla. 2010)); Vascular Imaging Prof'l, Inc. v. Dirigrad Corp., 401 F. Supp. 3d 1005, 1010 (S.D. Cal. 2019) ("declaratory relief is appropriate where a breach of contract claim will not settle all of the contractual issues concerning which plaintiff seeks declaratory relief."). "Such claims for declaratory judgment must be forward-looking, rather than retrospective, as any retrospective declaration would be equally solved by resolution of the breach of contract claim." Rausnitz, 2019 WL 7643148, at *2.

The Declaratory Judgment Act authorizes federal courts to declare the rights of interested parties in a case of actual controversy. See Almonte v. Administracion de Correcion, 15 F. Supp. 2d 180, 181 (D.P.R. 1998); 28 U.S.C. § 2201 ("In a case of actual controversy within its

jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). An actual controversy is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Almonte, (quoting Diagnostic Unit Inmate Council v. Films Inc., 88 F.3d 651, 653 (8th Cir. 1996)). Even if there is an actual controversy, "the granting of declaratory relief is within the discretion of the district court." Richmond Steel, Inc. v. Legal and General Assur. Soc., Ltd., 799 F. Supp. 234, 237 (D.P.R. 1992); see also El Dia, Inc. v. Hernández Colón, 963 F.2d 488 (1st Cir. 1992) ("declaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201, is discretionary.").

In determining whether to grant declaratory relief, a court should consider whether a declaratory judgment would "clarify the legal questions at issue and expedite resolution of the controversy." Richmond Steel, Inc., 799 F. Supp. at 237 (citing Metro. Property & Liability Ins. Co. v. Kirkwood, 729 F.2d 61, 62 (1st Cir. 1984)). "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Id. (citations omitted). "The remedy of a declaratory judgment 'is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued.'" Norton Lilly Int'l, Inc. v. Puerto Rico Ports Auth., Civ. No. 18-1012, 2018 WL 5099758, at *3 (D.P.R. Oct. 17, 2018) (quoting Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2751 (4th ed. 2018)).

**2. Whether Chapter 9 Applies to the Master Agreement**

In the case at hand, there is an immediate and real controversy within the court's jurisdiction. The issue is whether Xynergy is entitled to enforcement of all applicable remedies available to a secured party pursuant to Chapter 9. A declaratory judgment on this issue would be useful in clarifying the legal relations at hand because the amounts due on the Disputed Invoices were paid to Geodata but remain unpaid to Xynergy. While Xynergy brought a breach of contract claim against Geodata, the resolution of the breach of contract claim would not clarify the extent of Xynergy's rights under Chapter 9. A declaratory judgment would resolve the legal dispute between the parties and provide a final resolution to the controversy.

Under the revised Commercial Transactions Act, Chapter 9 applies to "a sale of accounts, chattel paper, payment intangibles, or promissory notes." 19 L.P.R.A. § 2219(a). [13] Accounts means "a right to payment of a monetary obligation, whether or not earned by performance, for services rendered or to be rendered." 19 L.P.R.A. § 2212(a)(2)(iii). In the case at hand, Geodata's accounts receivable contemplated by the Master Agreement and accompanying term sheets are accounts under Chapter 9 because they are related to Geodata's rights to payment of monetary obligations from the Municipality for services Geodata rendered to the Municipality for its medical collection and billing services.

The next step of the analysis is whether the transaction in the Master Agreement was for a sale or a loan. Courts consider a common set of elements in determining whether a particular transaction constitutes a sale or a loan. In re Burm, 554 B.R. 5, 17 (Bankr. D. Mass. 2016). These factors include (1) the intent of the parties; (2) whether the seller's creditors are notified that

---

[13] The U.C.C. refers to its section regarding secured transactions as "Article 9" whereas the Commercial Transactions Act refers to its corresponding section as "Chapter 9."

payments are to be made to the buyer of the accounts and/or whether the buyer takes

responsibility for account collection, and (3) whether the transaction is non-recourse. Id.

In the case at bar, an examination of the Master Agreement within the context of these

factors leads to a determination that the contract between Geodata and Xynergy was for the sale

of accounts receivable. See ECF No. 142-10. First, the parties clearly intended the Master

Agreement to be for the sale of accounts receivable. The Master Agreement states that Geodata

"shall treat transfers to [Xynergy] of Purchased Accounts hereunder as a sale for all purposes."

ECF No. 142-10, at 10, ¶ 8(d)(i). It describes Geodata and Xynergy's "mutual intent . . . that the

purchase of any Purchased Account is, as intended by the parties to be a true sale." Id. at 12,

¶ 9(c). The Master Agreement also emphasizes that the parties "hereunder exclusively and solely

engage in the purchase and sale of Accounts, and that none of these transactions constitute a

lending arrangement or a loan." Id. at 16, ¶ 16(r).

Second, the Master Agreement states that Geodata "shall take all necessary and

appropriate steps, including the sending of a notice to Third Party Obligors of Non-

Governmental Accounts . . . to assure that all proceeds paid with respect to all Non-

Governmental Accounts . . . be sent exclusively to the Purchaser Lockbox." Id. at 4, ¶ 4.2(a).

Thus, per the terms of the contract, Geodata was to instruct the Municipality to send payments

directly to Xynergy. Neither party has brought to the attention of the court any portion of the

Master Agreement to show that it was recourse. For example, it has not been indicated that

Geodata had to warrant the creditworthiness of the account debtors or that Xynergy did not incur

the risk of non-collection of the purchased accounts. See In re Siskey Hauling Co., Inc., 456 B.R.

597, 607 (Bankr. N.D. Ga. 2011) (citing Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.,

602 F.2d 538, 544–45 (3d Cir. 1979)). Thus, the Master Agreement between Xynergy and Geodata was for the sale of accounts receivable.

### 3. Application of Chapter 9 to the Master Agreement

Under Chapter 9, an account means "a right to payment of a monetary obligation, whether or not earned by performance;" an account debtor means "a person obligated on an account;" a debtor means "a seller of accounts;" and a secured party is "a person to which accounts have been sold." 19 L.P.R.A. §§ 2212(a)(2); (a)(3); (a)(28)(B); (a)(73)(D). In relation to the transactions relevant to this case, Geodata agreed to sell accounts receivable to Xynergy related to services that Geodata performed and invoiced to the Municipality. ECF 142-10, at 1. On February 20, 2014, Geodata and Xynergy sent the Notice of Assignment to the Municipality informing it that Geodata had assigned its present and future accounts receivable to Xynergy. ECF No. 142-8, at 1. The Notice of Assignment instructed the Municipality to remit all payments for all of Geodata's accounts receivable to Xynergy until notified otherwise by Xynergy only. Id. Therefore, the Disputed Invoices sold by Geodata to Xynergy are "accounts;" the Municipality is an "account debtor" because it was obligated to pay the amount on the Disputed Invoices; Geodata is a "debtor" because it sold the accounts receivable; and Xynergy is a "secured party" because the accounts were sold to it.

The Master Agreement provides that Xynergy was granted "a first priority security interest in and to the Collateral to secure the Obligations." ECF No. 142-10, at 12, ¶ 9(b). As stated earlier, under the Master Agreement, Obligations "means all present and future obligations owing by [Geodata] to [Xynergy] whether arising hereunder or otherwise by Seller to Purchaser, and whether arising before, during, or after the commencement of any Bankruptcy Event." ECF No. 142-10, at 1, ¶ 2(d). Collateral includes, among other things, Geodata's right, title, and

28

interest in the Reserve Account, all payments due to Geodata from Xynergy, accounts receivable of Geodata whether purchased or not, and all of Geodata's chattel paper, inventory, equipment, instruments, investment property, documents, letter of credit rights, commercial tort claims, and general intangibles. ECF No. 142-10, at 12, ¶ 9(a). Thus, Xynergy has a security interest in all the Collateral as defined in the Master Agreement to secure Geodata's Obligations under the Master Agreement.

Xynergy's contention, however, that it has "a valid and enforceable security interest over all assets of Geodata, now existing or hereafter arising" deserves close scrutiny. ECF No. 142, at 14-15. On February 28, 2014, a U.C.C. financing statement was filed at the Department of State of Puerto Rico by Xynergy. ECF No. 142-13, at 1. The financing statement described Geodata as the debtor and Xynergy as the secured party and it indicated that it covered all assets of the debtor, now existing and hereafter arising, wherever located and described. Id. "The case law makes it abundantly clear that a financing statement is intended merely to put a searcher on notice that an underlying security agreement may be outstanding.'" In re Cushman Bakery, 526 F.2d 23, 29 (1st Cir. 1975) (citations omitted).

A financing statement is not a substitute for a security agreement. See In re Levitz Ins. Agency, 152 B.R. 693, 698 (Bankr. D. Mass. 1992); Shelton v. Erwin, 472 F.2d 1118, 1120 (8th Cir. 1973) ("The financing statement is merely evidence of the creation of a security interest, not the agreement itself."); In re Florida Bay Trading Co., 177 B.R. 374, 382 (Bankr. M.D. Fla. 1994) ("Unlike the security agreement, a financing statement was not designed to create a security interest but to perfect the interest already attached."). "Where a security agreement covers only certain assets, the financing statement's inclusion of additional assets is ineffective to

create a security interest in the additional assets omitted from the security agreement." <u>See</u> <u>In re</u> <u>Levitz Ins. Agency</u>, 152 B.R. at 698.

In the case at hand, the mere fact that Xynergy filed a financing statement indicating that it covered all assets of Geodata is insufficient to create a security interest in all assets of Geodata. <u>Id</u>. Xynergy's security interest in this case arises from the security agreement which includes the Collateral defined in the Master Agreement. The financing statement here perfects Xynergy's security interest in the Collateral contemplated by the Master Agreement as it put a "searcher on notice that an underlying security agreement may be outstanding." <u>In re Cushman Bakery</u>, 526 F.2d at 29. Therefore, Xynergy's security interest to secure Geodata's Obligations under the Master Agreement is limited to the Collateral as defined in the Master Agreement.

**4. Xynergy's Remedy Under Chapter 9**

Under Chapter 9, "a secured party: (1) may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure, and (2) if the collateral is documents, may proceed either as to the documents or as to the goods they cover." 19 L.P.R.A. § 2361(a). Further, "the security interest shall continue when the secured party has reduced its claim to judgment, and shall secure the judgment without interruption whether or not the security interest is expressly recognized in the judgment, except to the extent the judgment expressly provides to the contrary." 19 L.P.R.A. § 2361(e). If so agreed, and in any event after default, a secured party

> (1) May notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party;
>
> (2) may take any proceeds to which the secured party is entitled under § 2265 of this title;
>
> (3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the

account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral.

19 L.P.R.A. § 2367(a)(1)-(3).

Under the Master Agreement, Xynergy was granted a security interest in all the Collateral to secure Geodata's Obligations and authorized to file a financing statement. ECF No. 142-10, at 9, ¶ 8(a); ECF No. 142-10, at 12, ¶ 9(b). On February 28, 2014, Xynergy filed a U.C.C. financing statement that covered all the assets of Geodata. See ECF No. 142-13, at 1. Geodata also granted to Xynergy the right to notify Geodata's third party obligors to make direct payments on the purchased accounts to Xynergy. ECF No. 142-10, at 10, ¶ 8(b); ECF No. 142-10, at 12, ¶8 (p). Thus, Xynergy is entitled to enforcement of all applicable remedies available to a secured party pursuant to Chapter 9.

## V.    Conclusion

For the foregoing reasons, there being no material facts in controversy, Xynergy's motion for summary judgment against Geodata (ECF No. 142) is GRANTED IN PART AND DENIED IN PART. Xynergy's Article 1802 claim does not exist independently from its breach of contract claim, and thus, it is DISMISSED WITH PREJUDICE. Therefore, Xynergy's request for $1,019,499.19 in damages for its tort claim is DENIED. Geodata breached the Master Agreement and owes to Xynergy a misdirected payment penalty in the amount of $254,874.80; a prepayment penalty in the amount of $132,532.68; and attorney's fees and costs in the amount of $91,596.61. Geodata also breached the Master Agreement when it failed to repurchase the Disputed Invoices from Xynergy. Consequently, Xynergy is entitled to the payment of the Repurchase Price of the Disputed Invoices from Geodata in the amount of $815,119.35 plus the

amount of Xynergy's discount fees for the Disputed Invoices through the date of Geodata's repurchase of the Disputed Invoices.

Xynergy has a valid and enforceable security interest in all the Collateral as defined in the Master Agreement to secure Geodata's Obligations under the Master Agreement, including any invoiced amounts due to Geodata from the Municipality.[14]

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 29th day of January, 2021.

s/Marcos E. López
U.S. Magistrate Judge

---

[14] The other requests by Xynergy in the motion for summary judgment will be addressed once all dispositive motions have been ruled upon.