## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

XYNERGY HEALTHCARE CAPITAL II
LLC,

      Plaintiff,

          v.                                  CIVIL NO.: 18-1208 (MEL)

MUNICIPALITY OF SAN JUAN, et al.

      Defendants.

## OPINION AND ORDER

### I.    Procedural Background

Xynergy Healthcare Capital II LLC ("Xynergy") filed an amended complaint against the

Municipality of San Juan ("the Municipality" or "MSJ") and GEODATAPR International, Inc.

("Geodata") on August 26, 2018. ECF No. 20. In the amended complaint, Xynergy alleges that

Geodata is liable to Xynergy for breach of contract damages under the Healthcare Receivables

Master Purchase and Sale Agreement ("Master Agreement"). Id. at 11-12, 15-16. It is also

alleged by Xynergy that it has a valid and enforceable security interest over all assets of Geodata.

Additionally, Xynergy seeks a declaratory judgment that the Municipality and Geodata are

jointly and severally liable for certain unpaid payment obligations under the Master Agreement

and Chapter 9 of Title 19, Annotated Laws of Puerto Rico, Section 2211, et. seq. ("the

Commercial Transactions Act"). Id. at 11, 15-16.

On September 14, 2018, the Municipality filed a motion to dismiss the complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 35. The Municipality's motion to

dismiss was denied on September 19, 2019. ECF No. 136. The Municipality answered the

complaint on September 26, 2019. ECF No. 138. Pending before the court is a motion for summary judgment filed by Xynergy against the Municipality. ECF No. 143. Xynergy requests that the Court enter a summary judgment:

> (1) ordering the Municipality to pay to Xynergy the amount of $1,019,499.19, as it failed to discharge its payment obligations under the accounts receivable claimed in this case;

> (2) decreeing that under the law, Xynergy has a valid and enforceable security interest over all assets of Geodata, now existing or hereafter arising, wherever located, including and not limited to all of Geodata's receivables from the Municipality;

> (3) decreeing that any amount due or to become due by the Municipality to Geodata, is an asset of Xynergy and consequently, ordering the Municipality to pay Xynergy any amount to be paid by the Municipality for any invoiced amount due to Geodata, until all the amounts owed to Xynergy by Geodata are paid;

> (4) granting all other further relief that is necessary or proper to effectuate the judgment.

ECF No. 143, at 18-19. The Municipality subsequently filed a response in opposition. ECF No. 152.

## II.     Standard of Review

### A. Summary Judgment Standard

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992) (citations omitted). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the

litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting

Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a

genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the

movant presents a properly focused motion "averring 'an absence of evidence to support the

nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of

at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d

112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).

For issues where the nonmoving party bears the ultimate burden of proof, the party cannot

merely "rely on an absence of competent evidence, but must affirmatively point to specific facts

[in the record] that demonstrate the existence of an authentic dispute." McCarthy v. Nw.

Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citation omitted). The party need not, however,

"rely only on uncontradicted evidence . . . . So long as the [party]'s evidence is both cognizable

and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to

determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of

Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original) (citation omitted).

In assessing a motion for summary judgment, the court "must view the entire record in

the light most hospitable to the party opposing summary judgment, indulging all reasonable

inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115. There is "no room for credibility

determinations, no room for the measured weighing of conflicting evidence such as the trial

process entails, [and] no room for the judge to superimpose his own ideas of probability and

likelihood." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The

court may, however, safely ignore "conclusory allegations, improbable inferences, and

unsupported speculation." <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

**B. Declaratory Judgment Standard**

"The merits of a declaratory judgment action may be properly asserted by the parties in a motion for summary judgment." <u>Allstate Ins. Co. v. Martinez</u>, Civ. No. 11-574, 2012 WL 1379666, at *4 (D. Conn. Apr. 20, 2012). "In determining a motion for summary judgment that is filed in the context of a declaratory judgment action, the same standard is applied as in any other action." <u>Roe v. City of New York</u>, 232 F. Supp. 2d 240, 252 (S.D.N.Y. 2002); <u>Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.</u>, 298 F.3d 201, 210 n.12 (3d Cir. 2002) ("The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief"); <u>American Family Mut. Ins. Co. v. Eagle General Contractors</u>, Civ No. 6-993, 2007 WL 3090765, at *1 (D. Colo. Oct. 18, 2007).

"Declaratory judgment claims may properly coexist with breach of contract claims when they provide the plaintiff a form of relief unavailable under the breach of contract claim." <u>Rausnitz v. Transamerica Life Ins. Co.</u>, Civ. No. 19-22894, 2019 WL 7643148, at *2 (S.D. Fla. Dec. 13, 2019) (citing <u>Kenneth F. Hackett & Assoc., Inc. v. GE Capital Info. Tech. Solutions, Inc.</u>, 744 F. Supp. 2d 1305, 1311 (S.D. Fla. 2010)); <u>Vascular Imaging Prof'l, Inc. v. Dirigrad Corp.</u>, 401 F. Supp. 3d 1005, 1010 (S.D. Cal. 2019) ("declaratory relief is appropriate where a breach of contract claim will not settle all of the contractual issues concerning which plaintiff seeks declaratory relief."). "Such claims for declaratory judgment must be forward-looking, rather than retrospective, as any retrospective declaration would be equally solved by resolution of the breach of contract claim." <u>Rausnitz</u>, 2019 WL 7643148, at *2.

The Declaratory Judgment Act authorizes federal courts to declare the rights of interested parties in a case of actual controversy. See Almonte v. Administracion de Correcion, 15 F. Supp. 2d 180, 181 (D.P.R. 1998); 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). An actual controversy is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Almonte, (quoting Diagnostic Unit Inmate Council v. Films Inc., 88 F.3d 651, 653 (8th Cir. 1996)). Even if there is an actual controversy, "the granting of declaratory relief is within the discretion of the district court." Richmond Steel, Inc. v. Legal and General Assur. Soc., Ltd., 799 F. Supp. 234, 237 (D.P.R. 1992); see also El Dia, Inc. v. Hernández Colón, 963 F.2d 488 (1st Cir. 1992) ("declaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201, is discretionary.").

In determining whether to grant declaratory relief, a court should consider whether a declaratory judgment would "clarify the legal questions at issue and expedite resolution of the controversy." Richmond Steel, Inc., 799 F. Supp. at 237 (citing Metro. Property & Liability Ins. Co. v. Kirkwood, 729 F.2d 61, 62 (1st Cir. 1984)). "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Id. (citations omitted). "The remedy of a declaratory judgment 'is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action

5

after the damage has accrued.'" <u>Norton Lilly Int'l, Inc. v. Puerto Rico Ports Auth.</u>, Civ. No. 18-

1012, 2018 WL 5099758, at *3 (D.P.R. Oct. 17, 2018) (quoting Wright & Miller, 10B Fed. Prac.

& Proc. Civ. § 2751 (4th ed. 2018)).

## III.   Uncontested Material Facts[1]

Xynergy is a limited liability company organized under the laws of the state of Florida.

ECF No. 143-1, at 1, ¶ 1; ECF No. 152-1, at 1 ¶ 1. Mr. Alejandro Nathan ("Mr. Nathan") is the

President of Xynergy. ECF No. 143-1, at 1, ¶ 2; ECF No. 143-3, at 1. Geodata is a Puerto Rico

domestic corporation. ECF No. 143-1, at 2, ¶ 3; ECF No. 152-1, at 2, ¶ 3. Since its inception and

up to June 27, 2014, Mr. José R. Rivera Barrera ("Mr. Rivera") was Geodata's President. ECF

No. 143-1, at 2, ¶ 4; ECF No. 143-24, at 1, ¶ 2. On June 27, 2014, Mr. Antonio A. Usero

Quiñones ("Mr. Usero") became Geodata's President and as of April 26, 2018 was still holding

that position. ECF No. 143-1, at 2, ¶¶ 5, 6, 7; ECF No. 143-5, at 1-2; ECF No. 143-6, at 1-2;

ECF No. 143-7, at 1-3.[2]

In early 2014, Geodata entered into a contract with the Municipality to perform

"the billing, reconciliation personnel and the collection of the medical-hospital services"

rendered by the Municipality. ECF No. 152-2, at 9, ¶ 2.2; ECF No. 143-24, at 2, ¶ 3. The scope

of services provided by Geodata under the contract included in pertinent part: admissions, pre-

certification and authorization, billing to medical plans (paper and electronic), claims and follow-

up, Medicare reports necessary with medical plans, and technical direction related to billing

systems and procedures of health services and the infrastructure that facilitates said services.

---

[1] The following facts are deemed admitted despite the Municipality's denial because the denial does not contradict the relevant proposed facts: 2, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 43, 44, 45, 46. ECF Nos. 143-1, 152-1. Local Rule 56(e) provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."

[2] At some point in time, Mr. Usero became Geodata's Chief Executive Officer. ECF No. 143-1, at 2, ¶ 7; ECF No. 143-7, at 1-3.

ECF No. 152-2, at 4-7, ¶¶ 3.13-3.20. Geodata was compensated for its services by billing monthly invoices to the Municipality. ECF No. 152-2, at 20-23, ¶¶ 5.2, 5.5.

On February 20, 2014, Geodata and Xynergy sent the Municipality a Notice of Perpetual Assignment and Change of Payee ("Notice of Assignment"). ECF No. 143-1, at 2, ¶ 8; ECF No. 143-8, at 1. The Notice of Assignment informed the Municipality that Geodata assigned its present and future accounts receivable to Xynergy and instructed the Municipality to remit all payments for Geodata's accounts receivable to Xynergy until notified otherwise by Xynergy only. ECF No. 143-1, at 2-3, ¶ 9; ECF No. 143-8, at 1. The Notice of Assignment is in the records of the Municipality under the custody of the Finance Department. ECF No. 143-1, at 3, ¶ 10; ECF No. 143-23, at 2, ¶ 4.

Accordingly, on February 25, 2014, Geodata and Xynergy entered into the contract titled the Master Agreement. ECF No. 143-1, at 3, ¶ 12; ECF No. 143-10. The purpose of the Master Agreement was for the sale of Geodata's accounts receivable to Xynergy that came from the billing and collection services provided to the Municipality. ECF No. 143-1, at 3, ¶ 13; ECF No. 143-10, at 1; ECF No. 143-24, at 1, ¶ 4. It enabled "Geodata to obtain cash [from Xynergy] in 2 or 3 days for the services billed to [the Municipality], instead of waiting for payment on the invoices a month or two after billing." ECF No. 143-24, at 2, ¶ 7. In addition to the Master Agreement, Xynergy and Geodata signed a term sheet that set forth several terms applicable to the purchase of Geodata's accounts receivable. ECF No. 143-1, at 3, ¶ 11; ECF No. 143-9, at 1-3.

The payment process set forth in the Master Agreement established that for each account sold Xynergy would pay an initial down payment to Geodata. The initial down payment consisted of the advance rate percentage stated on the term sheet of the net realizable amount of

each account. ECF No. 143-1, at 4, ¶ 15; ECF No. 143-10, at 1, ¶ 2(a); ECF No. 143-25, at 4, ¶ 10. The initial down payment was set at 80% of the expected net realizable amount in each of the term sheets agreed to by Geodata. ECF No. 143-1, at 4-5, ¶ 18; ECF No. 143-9, at 1, ¶ 3; ECF No. 143-14, at 1, ¶ 3; ECF No. 143-16, at 1, ¶ 3; ECF No. 143-25, at 4, ¶ 10. The net realizable amount of an account consisted of 100% of the gross amount that Geodata billed to the Municipality. ECF No. 143-1, at 4, ¶¶ 16-17; ECF No. 143-10, at 2, ¶ 2(e); ECF No. 143-10, at 22. The Master Agreement established that after Xynergy purchased an account from Geodata, all of Geodata's right, title, and interest in the purchased account automatically vested in Xynergy, which thereby became the sole and absolute owner of the account. ECF No. 143-1, at 4, ¶ 14; ECF No. 143-10, at 2, ¶ 3.1.

After Xynergy paid the initial down payment to Geodata, Xynergy would be entitled to accrue discount fees of 0.1% per day of the net realizable amount of the purchased account until Xynergy received payment of the net realizable amount due on the purchased account from the Municipality. ECF No. 143-10, at 1; ECF No. 143-25, at 4, ¶ 11. After Xynergy received payment on the purchased account from the Municipality, Xynergy was required to make a second payment to Geodata to complete the purchase price set forth in the Master Agreement. ECF No. 143-1, at 5, ¶ 19; ECF No. 143-25, at 4, ¶ 10. The second payment consisted of the net realizable amount of the account minus the initial down payment, any deducted expenses, and the discount fees. ECF No. 143-25, at 4, ¶ 10; ECF No. 143-10, at 1 ¶ 2(a).

In the Master Agreement, Geodata represented and warranted to Xynergy that it had all the power and authority necessary to sell its accounts and to convey good and marketable title and ownership of the purchased accounts to Xynergy. ECF No. 143-1, at 5, ¶ 20; ECF No. 143-10, at 7, ¶ 7(a)(i). Geodata also represented and warranted to Xynergy that its execution and

performance of the agreement was duly authorized. ECF No. 143-1, at 5, ¶ 21; ECF No. 143-10, at 7, ¶ 7(a)(i), ECF No. 143-24, at 1, ¶ 5. Further, Geodata also represented and warranted to Xynergy that the execution, delivery, and performance of the agreement did not and would not violate any provision of law, regulation or any provision of its organizational documents. ECF No. 143-1, at 5-6, ¶ 22; ECF No. 143-10, at 7, ¶ 7(a)(iii).

In the Master Agreement, Geodata represented and warranted to Xynergy that it had valid business reasons for selling the purchased accounts rather than obtaining a loan with the accounts as collateral. ECF No. 143-1, at 6, ¶ 23; ECF No. 143-10, at 8, ¶ 7(a)(vii). The Master Agreement also contained a provision where Geodata agreed to treat transfers to Xynergy of purchased accounts as a sale for all purposes. ECF No. 143-1, at 6, ¶ 24; ECF No. 143-10, at 10, ¶ 8(d)(i). Further, Geodata agreed pursuant to the Master Agreement to promptly advise all persons and entities who inquire about the ownership of any purchased accounts that the purchased accounts had been sold to Xynergy. ECF No. 143-1, at 6, ¶ 25; ECF No. 143-10, at 10, ¶ 8(d)(i). Under the Master Agreement, Geodata agreed not to impede or interfere with Xynergy's collection of any purchased accounts. ECF No. 143-1, at 6, ¶ 26; ECF No. 143-10, at 10, ¶ 8(d)(vi). Geodata also agreed not to claim any ownership interest in any purchased account according to the Master Agreement. ECF No. 143-1, at 6, ¶ 27; ECF No. 143-10, at 10, ¶ 8(d)(x). As it was notified to the Municipality in the Notice of Assignment, under the Master Agreement, Geodata was required to notify Third Party Obligors of Non-Governmental Accounts that all proceeds paid with respect to the accounts sold to Xynergy, be sent exclusively to Xynergy's lockbox. ECF No. 143-1, at 7, ¶ 29; ECF No. 143-10, at 4, ¶ 4.2(a).

The Master Agreement specifically provides that Xynergy was granted "a first priority security interest in and to the Collateral to secure the Obligations." ECF No. 143-10, at 12,

9

¶ 9(b). Under the Master Agreement, "Obligations" means "all present and future obligations owing by [Geodata] to [Xynergy] whether arising hereunder or otherwise by [Geodata] to [Xynergy], and whether arising before, during, or after the commencement of any Bankruptcy Event." ECF No. 143-10, at 1, ¶ 2(d). Meanwhile, "Collateral" means

> all of [Geodata's] right, title, and interest in, to, and under any and all of the following: (1) the Reserve Account and all payments (if any) due or to become due to [Geodata] from [Xynergy]; (2) all now owned or existing or hereafter acquired accounts receivable of [Geodata] (whether offered for purchase or not, and whether purchased or not), hardware and software pertaining to or related to the Accounts and Purchased including but not limited to all rights to payment under any agreements with Third Party Obligors as defined therein; (3) all records and documents of every kind, including all electronically stored data (other than patient medical records to the extent protected from disclosure by law) and all other information that may assist [Xynergy] in the collection or realization of the Collateral and (4) all of [Geodata's] now owned and hereafter acquired Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, letter of Credit Rights, Commercial Tort Claims, and General Intangibles, and (5) all proceeds of the foregoing (all of such terms, as applicable, are presently or hereafter defined in the Uniform Commercial Code).

ECF No. 143-10, at 12, ¶ 9(a).

Xynergy was authorized under the Master Agreement to file financing statements under the Uniform Commercial Code ("U.C.C.") naming Xynergy as the secured party and Geodata as the debtor. ECF No. 143-1, at 6, ¶ 28; ECF No. 143-10, at 9, ¶ 8(a). On February 28, 2014, an U.C.C. financing statement was filed at the Department of State of Puerto Rico by Xynergy. ECF No. 143-1, at 7, ¶ 30; ECF No. 143-13, at 1. The financing statement described Geodata as the debtor and Xynergy as the secured party and it indicated that it covered all assets of the debtor, now existing and hereafter arising, wherever located and described. ECF No. 143-1, at 7, ¶ 30; ECF No. 143-13, at 1.

After the Municipality received the Notice of Assignment, from the year 2014 and up to June 30, 2018, in relation to the services rendered by Geodata to the Municipality, the

Municipality paid to the order of both Geodata and Xynergy, the amount of $18,668,682.62. ECF No. 143-1, at 7, ¶ 31; ECF No. 143-20, at 7-8, ¶ 5; ECF No. 143-25, at 6, ¶ 13; ECF No. 152-1, at 17, ¶ 31.

Between March 7, 2017 and March 6, 2018, Geodata sold 17 invoices (hereinafter "Disputed Invoices"), for services rendered by Geodata to the Municipality, to Xynergy which remain unpaid to Xynergy. The Disputed Invoices are not part of the $18,668,682.62 amount that the Municipality paid to both Geodata and Xynergy. ECF No. 143-1, at 7-8, ¶ 32; ECF No. 143-25, at 6-15, ¶¶ 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44. The aggregate amount of the Disputed Invoices that Geodata sold to Xynergy is $1,019,499.19 and are the following:

1. Invoice No. 002-2017 Cont. February 2017, dated March 7, 2017, requesting payment from the Municipality in the amount of $341,996.51. ECF No. 143-25, at 14-15, ¶ 44; ECF No. 143-41, at 1-3.

2. Invoice No. 2017-013, dated July 24, 2017, requesting payment from the Municipality in the amount of $39,166.04. ECF No. 143-25, at 6, ¶ 14; ECF No. 143-26, at 1, 2.

3. Invoice No. 2017-014, dated August 7, 2017, requesting payment from the Municipality in the amount of $39,008.55. ECF No. 143-25, at 6-7, ¶ 16; ECF No. 145-5, at 1; ECF No. 145-6, at 1.

4. Invoice No. 2017-015, dated August 20, 2017, requesting payment from the Municipality in the amount of $46,116.94. ECF No. 143-25, at 7, ¶ 18; ECF No. 143-28, at 1, 2.

5. Invoice No. 2017-016, dated September 3, 2017, requesting payment from the Municipality in the amount of $40,536.64. ECF No. 143-25, at 8, ¶ 20; ECF No. 143-29, at 1, 2.

6. Invoice No. 2017-017, dated October 4, 2017, requesting payment from the Municipality in the amount of $37,258.29. ECF No. 143-25, at 8, ¶ 22; ECF No. 143-30, at 1, 2.

7. Invoice No. 2017-018, dated October 4, 2017, requesting payment from the Municipality in the amount of $27,985.31. ECF No. 143-25, at 8, ¶ 22; ECF No. 143-30, at 1, 5.

8. Invoice No. 2017-019, dated October 18, 2017, requesting payment from the Municipality in the amount of $42,478.54. ECF No. 143-25, at 9, ¶ 24; ECF No. 143-31, at 1, 2.

9. Invoice No. 2017-020, dated November 1, 2017, requesting payment from the Municipality in the amount of $45,282.74. ECF No. 143-25, at 9, ¶ 26; ECF No. 143-32, at 1, 2.

10. Invoice No. 2017-021, dated November 16, 2017, requesting payment from the Municipality in the amount of $49,161.97. ECF No. 143-25, at 10, ¶ 28; ECF No. 143-33, at 1, 2;

11. Invoice No. 2017-022, dated December 1, 2017, requesting payment from the Municipality in the amount of $40,722.26. ECF No. 143-25, at 10-11, ¶ 30; ECF No. 143-34, at 1, 2;

12. Invoice No. 2017-023, dated December 18, 2017, requesting payment from the Municipality in the amount of $48,250.05. ECF No. 143-25, at 11, ¶ 32; ECF No. 143-35, at 1, 2.

13. Invoice No. 2017-024, dated January 2, 2018, requesting payment from the Municipality in the amount of $40,654.82. ECF No. 143-25, at 12, ¶ 34; ECF No. 143-36, at 1, 2.

14. Invoice No. 2018-001, dated January 18, 2018, requesting payment from the Municipality in the amount of $38,069.73. ECF No. 143-25, at 12, ¶ 36; ECF No. 143-37, at 1, 2.

15. Invoice No. 2018-002, dated February 2, 2018, requesting payment from the Municipality in the amount of $54,900.61. ECF No. 143-25, at 13, ¶ 38; ECF No. 143-38, at 1, 2.

16. Invoice No. 2018-003, dated February 16, 2018, requesting payment from the Municipality in the amount of $47,967.10. ECF No. 143-25, at 13, ¶ 40; ECF No. 143-39, at 1, 2.

17. Invoice No. 2018-004, dated March 1, 2018, requesting payment from the Municipality in the amount of $39,943.09. ECF No. 143-25, at 14, ¶ 42; ECF No. 143-40, at 1. 2.

ECF No. 143-1, at 8-9, ¶ 33.

In relation to the Disputed Invoices described above, Xynergy paid to Geodata the aggregate amount of $815,119.35 via wire transfer to Geodata's bank account.[3] ECF No. 143-1, at 9-10, ¶ 34; ECF No. 143-25, at 6-15, ¶¶ 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45. As of October 8, 2019, Xynergy had still not received payment from the Municipality or any other entity on the amounts due on any of the Disputed Invoices. ECF No. 143-1, at 10, ¶ 35; ECF No. 143-25, at 15, ¶ 46.

On March 26, 2018, through a legal representative, Xynergy delivered a letter to the Municipality to inform and reiterate that the Notice of Assignment remained in full force and effect and that all monies due or to become due under accounts receivable of Geodata shall be paid to Xynergy. ECF No. 143-1, at 10, ¶ 36; ECF No. 143-17; ECF No. 152-1, at 24, ¶ 36.

On or around March 28, 2018, through a legal representative, Geodata sent a letter to the Municipality dated March 28, 2018, stating that the Master Agreement and the assignment of present and future accounts receivable was null and void *ab initio*. ECF No. 143-1, at 10, ¶ 37; ECF No. 143-18, at 1-2; ECF No. 152-1, at 25, ¶ 37. In the letter, Geodata instructed the Municipality to make all payments pursuant to its service agreement with the Municipality payable only in favor of Geodata. ECF No. 143-1, at 11, ¶ 38; ECF No. 143-18, at 2. Geodata's legal representative sent another letter dated April 24, 2018, reiterating the request to make all payments pursuant to its service agreement with the Municipality, payable only in favor of Geodata. ECF No. 143-1, at 11, ¶ 39; ECF No. 143-19; ECF No. 152-1, at 25, ¶ 39. Geodata did not notify Xynergy of the two aforementioned letters. ECF No. 143-1, at 11, ¶ 40; ECF No. 143-

---

[3] The Master Agreement set the initial down payment as 80% of the net realizable amount of each purchased account. The aggregate amount of the Disputed Invoices that Geodata sold to Xynergy is $1,019,499.19. Accordingly, 80% of the aggregate amount of the Disputed Invoices is $815,599.35. The court notes the discrepancy in proposed fact number 34 that Xynergy paid $815,119.35 as the initial down payments in the aforementioned Disputed Invoices. However, upon closer examination, Xynergy paid wire transfer fees in the aggregate amount of $480.00 on the Disputed Invoices that were deducted from the initial down payments of the purchased accounts. *See* ECF No. 143-25, at 6-15.

25, at 16-17, ¶ 48. After Geodata sent the letter dated March 28, 2018, the Municipality stopped payments of money to the order of both Geodata and Xynergy, and paid to the order of Geodata only, the total amounts due on the Disputed Invoices. ECF No. 143-1, at 11, ¶ 41; ECF No. 143-23, at 3-7, ¶ 9-10, 16-18, 25; ECF No. 152-1, at 26-27, ¶ 41.

Of the Disputed Invoices, Invoice No. 2017-016, was paid to only Geodata on March 16, 2018, before Geodata sent the March 28, 2018 letter to the Municipality instructing it to make payments only to Geodata. ECF No. 143-1, at 12, ¶ 43; ECF No. 143-21, at 7, ¶ 11; ECF No. 143-21, at 11; ECF No. 152-1, at 28, ¶ 43. The following invoices were paid by the Municipality to Geodata during this litigation, after May 1, 2018, when the Municipality was served with a copy of the complaint: Invoice Nos. 2017-013, 2017-014, 2017-018, 2017-019, 2017-020, 2017-021, 2017-022, 2017-023, 2017-024, 2018-001, 2018-002, 2018-003, 2018-004. ECF No. 143-1, at 12, ¶ 44; ECF No. 143-21, at 7, ¶ 11; ECF No. 143-21, at 11-14.

## IV.   Legal Analysis

Xynergy alleges that the Municipality breached its duty to pay Xynergy the amounts due on the Disputed Invoices under Chapter 9 of the Commercial Transactions Act. ECF No. 143, at 6, 17. The Municipality, on the other hand, contends Chapter 9 does not apply to the Disputed Invoices for being an assignment of accounts which is for collection purposes only. ECF No. 152, at 10. It is further alleged by the Municipality, among other allegations, that even if Chapter 9 regulates the Master Agreement, the Notice of Assignment did not comply with the Autonomous Municipalities Act, and therefore, the Municipality is not bound to the terms in the Notice of Assignment. Id. at 11.

In the case at hand, there is an immediate and real controversy within the court's jurisdiction. The issue is whether the Municipality was obligated to pay the amounts due on the

Disputed Invoices to Xynergy and whether Xynergy is entitled to enforcement of all applicable remedies available to a secured party pursuant to Chapter 9. A declaratory judgment on this issue would be useful in clarifying the legal relations at hand because the amounts due on the Disputed Invoices were paid to Geodata but remain unpaid to Xynergy. A declaratory judgment would resolve the legal dispute between the parties and provide a final resolution to the controversy.

### A. Whether Chapter 9 Applies to the Master Agreement

In 2012, Puerto Rico's Commercial Transactions Act was amended to adopt several sections of Article 9 of the U.C.C. See In Re Cruz Rivera, 600 B.R. 132, 146 (1st Cir. B.A.P. 2019). Article 9 of the U.C.C. provides "a comprehensive scheme for the regulation of security interests in personal property and fixtures." U.C.C. § 9-101 (Am. Law Inst. & Unif. Law Comm'n 2017). Under the revised Commercial Transactions Act, Chapter 9 applies to "a sale of accounts, chattel paper, payment intangibles, or promissory notes." 19 L.P.R.A. § 2219(a). [4] Accounts means "a right to payment of a monetary obligation, whether or not earned by performance, for services rendered or to be rendered." 19 L.P.R.A. § 2212(a)(2)(iii). In the case at hand, Geodata's accounts receivable contemplated by the Master Agreement and accompanying term sheets are accounts under Chapter 9 because they are related to Geodata's rights to payment of monetary obligations from the Municipality for services Geodata rendered to the Municipality for its medical collection and billing services.

The next step of the analysis is whether the transaction in the Master Agreement was for a sale or a loan. Courts consider a common set of elements in determining whether a particular transaction constitutes a sale or a loan. In re Burm, 554 B.R. 5, 17 (Bankr. D. Mass. 2016). These factors include (1) the intent of the parties; (2) whether the seller's creditors are notified that

---

[4] The U.C.C. refers to its section regarding secured transactions as "Article 9" whereas the Commercial Transactions Act refers to its corresponding section as "Chapter 9."

payments are to be made to the buyer of the accounts and/or whether the buyer takes

responsibility for account collection, and (3) whether the transaction is non-recourse. Id.

In the case at bar, an examination of the Master Agreement within the context of these

factors leads to a determination that the contract between Geodata and Xynergy was for the sale

of accounts receivable. See ECF No. 143-10. First, the parties clearly intended the Master

Agreement to be for the sale of accounts receivable. The Master Agreement states that Geodata

"shall treat transfers to [Xynergy] of Purchased Accounts hereunder as a sale for all purposes."

ECF No. 143-10, at 10, ¶ 8(d)(i). It describes Geodata and Xynergy's "mutual intent . . . that the

purchase of any Purchased Account is, as intended by the parties to be a true sale." Id. at 12,

¶ 9(c). The Master Agreement also emphasizes that the parties "hereunder exclusively and solely

engage in the purchase and sale of Accounts, and that none of these transactions constitute a

lending arrangement or a loan." Id. at 16, ¶ 16(r).

Second, the Master Agreement states that Geodata "shall take all necessary and

appropriate steps, including the sending of a notice to Third Party Obligors of Non-

Governmental Accounts . . . to assure that all proceeds paid with respect to all Non-

Governmental Accounts . . . be sent exclusively to the Purchaser Lockbox." Id. at 4, ¶ 4.2(a). [5]

Thus, per the terms of the contract, Geodata was to instruct the Municipality to send payments

---

[5] According to the Master Agreement, "Accounts for which the Third Party Obligor is the United States of America
or any state or any agency or Instrumentality thereof or any state which is obligated to make any payments with
respect to Medicare or Medicaid Accounts or representing amounts owing under any other program established by a
federal or state law which provides for payments for healthcare goods or services to be made to the Provider are
hereinafter referred to as 'Governmental Accounts'; all other Accounts are sometimes hereinafter referred to as
'Non-Governmental Accounts'." ECF No. 143-10, at 1, ¶ 1. In the case at hand, the purchased accounts by Xynergy
were not accounts receivable that the Municipality was required to make payments with respect to "Medicare or
Medicaid Accounts or representing amounts owing under any other program established by a federal or state law
which provides for payments for healthcare goods or services to be made to [Geodata]." Instead, the purchased
accounts were related to the medical billing and collection services that Geodata provided to the Municipality. ECF
No. 143-1, at 3, ¶ 13; ECF No. 143-10, at 1; ECF No. 143-24, at 1, ¶ 4. The particular services contemplated by the
contracts between Geodata and the Municipality were not paid from federal funds, but rather from the
Municipality's ordinary funds. ECF No. 152-2, at 22, ¶¶ 5.3.2.6 and 5.4. Therefore, the accounts purchased by
Xynergy from Geodata were Non-Governmental Accounts.

directly to Xynergy. Third, neither party has brought to the attention of the court any portion of the Master Agreement to show that it was recourse. For example, it has not been indicated that Geodata had to warrant the creditworthiness of the account debtors or that Xynergy did not incur the risk of non-collection of the purchased accounts. See In re Siskey Hauling Co., Inc., 456 B.R. 597, 607 (Bankr. N.D. Ga. 2011) (citing Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538, 544–45 (3d Cir. 1979)). Thus, the Master Agreement between Xynergy and Geodata was for the sale of accounts receivable.

The Municipality, however, contends that Chapter 9 does not apply to the Master Agreement because it was only for the "collection of monies." ECF No. 152, at 10. Indeed, Chapter 9 does not apply to an assignment of accounts made for collection purposes only. See 19 L.P.R.A. § 2219(d)(5). "Because the text of the Commercial Transactions Act comes from the [U.C.C.], the court has looked to equivalent statutes in other jurisdictions." In re Allied Financial, Inc., 2020 WL 2026632, 616 B.R. 1, 7 (Bankr. D.P.R. 2020).

The U.C.C.'s exclusion of the assignment of accounts made for collection purposes only "'deals with a case in which a creditor sells its accounts or other intangibles to a collection agency not for the purpose of financing but for the purpose of collection.'" See In re C.W. Min. Co., 509 B.R. 378, 386 (Bankr. D. Utah 2014) (quoting 4 White, Summers, & Hillman, Uniform Commercial Code § 30:20 (6th ed. 2019)). The exclusion of accounts for the purpose of collection only "must necessarily apply only to assignments of a non-commercial nature . . . . To hold otherwise would permit the exception to engulf the rule and directly contravene the express policy of the Code to include transfers of contract rights under Chapter 9 as security interests." In re Cawthorn, 33 B.R. 119, 120 (Bankr. M.D. Tenn. 1983); see ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n, 27 F. Supp. 3d 494, 504-05 (S.D.N.Y. 2014) (explaining that an

assignment of a non-commercial nature refers to assignments "such as those to a collection agency for the sole purpose of facilitating collection of the debt ... [and] [i]t does not purport to exclude transactions generally considered financing in nature.").

In interpreting Louisiana's version of this U.C.C. provision, the Eastern District of Louisiana reasoned that "[a]n assignment is 'for collection only' where it allows an assignee to 'br[ing] suit to collect money owed to [its] assignors' and the assignee 'promised to turn over to those assignors the proceeds secured through litigation.'" SE Prop. Holdings, LLC v. Unified Recovery Group, LLC, 410 F. Supp. 3d 775, 781 (E.D. La. 2019) (citing Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 280 (2008)). Thus, the court found that a transaction that assigns the rights, title, and interest in the assigned account is not an assignment for collection purposes only. Id.

In Matter of Biloxi Prestress Concrete, Inc., a debtor's creditor assigned an account receivable, without transferring title, to another of the debtor's creditors so that it could collect on the first creditor's behalf. 98 F.3d 204, 206-08 (5th Cir. 1996). The creditors argued that Article 9 of the U.C.C. was not applicable to the assignment of its account receivable because it was made for collection purposes only. Id. at 208. The Fifth Circuit noted that the assignee did not pay the assignor for the account and that the assignee was not entitled to "collect and keep as its own the debt owed to [the assignor], but rather to collect merely as [the assignor's] agent." Id. at 208-09. Thus, the Fifth Circuit held that Article 9 was not applicable to the transaction between the assignor and assignee because the assignment of the accounts receivable was for collection purposes only. Id. The Fifth Circuit clarified, however, that "transactions relating to the creation or perfection of security interests . . . remain subject to the provisions of Article 9, absent other controlling provisions." Id. at 208.

In the case at hand, the Municipality's contention that Chapter 9 does not apply to the Master Agreement because the assignment of accounts was for collection purposes only is unfounded. First, unlike the assignee in <u>Biloxi</u> who did not pay the assignor for the account, Xynergy was obligated to pay an initial down payment to Geodata of 80% of the net realizable amount for each purchased account pursuant to the Master Agreement. ECF No. 143-1, at 4-5, ¶ 18; <u>see</u> <u>Matter of Biloxi</u>, 98 F.3d at 207; <u>see</u> <u>also</u> <u>In re Worden</u>, 63 B.R. 721, 724 (Bankr. D.S.D. 1986) (explaining that "a 'collection only' assignment does not involve an advance of money. Rather, the money is paid only if the collection is made."). Furthermore, the Master Agreement established that after Xynergy purchased an account, Geodata's rights, title, and interest in the purchased account automatically vested in Xynergy which is indicative that the assignment was not for collection purposes only. ECF No. 143-10, at 2, ¶ 3.1; <u>see</u> <u>SE Prop. Holdings, LLC</u>, 410 F. Supp. 3d at 781; <u>see</u> <u>also</u> <u>In re Allied Financial, Inc.</u>, 2020 WL 2026632, 616 B.R. 1, 7 (Bankr. D.P.R. 2020) (finding that the sale of a promissory note constituted a secured transaction under Chapter 9 where the party "obtained the promissory note through an endorsement, making it the owner of the promissory note, not a collection agency that was assigned the note for collection purposes.").

In the Master Agreement, Xynergy was granted a security interest in the Collateral to secure Geodata's Obligations under the contract. ECF No. 143-10, at 12, ¶ 9(b). Furthermore, Xynergy was authorized pursuant to the Master Agreement to file financing statements under the U.C.C. listing the collateral as "[a]ll assets of [Geodata], now existing or hereafter arising, wherever located." <u>Id</u>. at 9, ¶ 8(a). Geodata was also obligated to "take all actions deemed by [Xynergy] as necessary or desirable to effectuate the provisions of the Master Agreement and any documents delivered hereto, to evidence, protect and perfect the assignment of the title to the

19

Purchased Accounts and the grant of a security interest in and lien on the Accounts and to facilitate the collection of the Purchased Accounts." Id. at 9, ¶ 8(a) (emphasis added). On February 28, 2014, Xynergy filed a U.C.C. financing statement that covered all the assets of Geodata. See ECF No. 143-13, at 1. These provisions of the Master Agreement providing for the creation of a security interest in the accounts and Xynergy's filing of a U.C.C. financing statement are indicative that the assignment of Geodata's accounts receivable to Xynergy was not for purposes of collection only. See Matter of Biloxi, 98 F.3d at 208. Thus, Chapter 9 applies to the sale of accounts contemplated by the Master Agreement. See Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538 (3d Cir. 1979) (holding that Article 9 governs all transactions in accounts, including both sales of accounts and secured interests in accounts, thus even an outright buyer of accounts by definition has a security interest in the accounts which it purchases); In Re Cripps, 31 B.R. 541, 543 (Bankr. W.D. Okla. 1983).

**B. Application of Chapter 9 to the Master Agreement**

Chapter 9 establishes that an account debtor may discharge its obligations on an account by "paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee." 19 L.P.R.A. § 2306(a). Authenticate means "to sign; or with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." Id. at § 2212(7).[6] In order for the authenticated notification to be effective, it must indicate that (1) "that the amount due or to

---

[6] "An effective notification under subsection (a) must be authenticated. This requirement normally could be satisfied by sending notification on the notifying person's letterhead or on a form on which the notifying person's name appears. In each case the printed name would be a symbol adopted by the notifying person for the purpose of identifying the person and adopting the notification." The American Law Institute, Uniform Commercial Code, Official Text and Comments, § 9-406(a) (2017) (Official Comment 2); see Wheeling & Lake Erie Ry. Co. v. Maine Northern Ry. Co., Civ. No. 14-325, 2015 WL 5440787, at *5 n.6 (D. Me. Sept. 15, 2015).

become due has been assigned" and (2) "that payment is to be made to the assignee." <u>Id</u>. at § 2306(a). "After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." <u>Id</u>.

Under Chapter 9, an account means "a right to payment of a monetary obligation, whether or not earned by performance;" an account debtor means "a person obligated on an account;" a debtor means "a seller of accounts;" and a secured party is "a person to which accounts have been sold." 19 L.P.R.A. §§ 2212(a)(2); (a)(3); (a)(28)(B); (a)(73)(D). In relation to the transactions relevant to this case, Geodata agreed to sell accounts receivable to Xynergy related to services that Geodata performed and invoiced to the Municipality. ECF 143-10, at 1. On February 20, 2014, Geodata and Xynergy sent the Notice of Assignment to the Municipality informing it that Geodata had assigned its present and future accounts receivable to Xynergy. ECF No. 143-8, at 1. The Notice of Assignment instructed the Municipality to remit all payments for all of Geodata's accounts receivable to Xynergy until notified otherwise by Xynergy only. <u>Id</u>. Therefore, the Disputed Invoices sold by Geodata to Xynergy are "accounts;" the Municipality is an "account debtor" because it was obligated to pay the amount on the Disputed Invoices; Geodata is a "debtor" because it sold the accounts receivable; and Xynergy is a "secured party" because the accounts were sold to it.

In the case at hand, the Notice of Assignment is an authenticated notification because it was on Xynergy's letterhead, and it has the signatures of the assignor (Geodata) and the assignee (Xynergy). <u>See</u> ECF No. 143-8; 19 L.P.R.A. § 2212(7). The Notice of Assignment identified the rights assigned within because it informed that Geodata "has assigned its present and future accounts receivable" to Xynergy. ECF No. 143-8, at 1. The Notice of Assignment also instructed that the Municipality "remit all payments for all accounts receivable from Geodata payable to

21

[Xynergy]." Id. The letter explicitly stated that "[p]ayments made to any other party other than [Xynergy] will not discharge or relieve your obligation for payments due to Geodata." Id. Therefore, the Notice of Assignment was an effective authenticated notification because it identified that all of Geodata's present and future accounts receivable were assigned to Xynergy and indicated that payments were to be made to Xynergy as the assignee. See 19 L.P.R.A. § 2306(a). Thus, under Chapter 9, after the Municipality received the Notice of Assignment on February 20, 2014, it could only discharge its obligations to pay the Disputed Invoices by paying Xynergy. See id.

The Master Agreement provides that Xynergy was granted "a first priority security interest in and to the Collateral to secure [Geodata's] Obligations." ECF No. 143-10, at 12, ¶ 9(b). As stated earlier, under the Master Agreement, Obligations "means all present and future obligations owing by [Geodata] to [Xynergy] whether arising hereunder or otherwise by Seller to Purchaser, and whether arising before, during, or after the commencement of any Bankruptcy Event." ECF No. 143-10, at 1, ¶ 2(d). Collateral includes, among other things, Geodata's right, title, and interest in the Reserve Account, all payments due to Geodata from Xynergy, accounts receivable of Geodata whether purchased or not, and all of Geodata's chattel paper, inventory, equipment, instruments, investment property, documents, letter of credit rights, commercial tort claims, and general intangibles. ECF No. 143, at 12, ¶ 9(a). Thus, Xynergy has a security interest in all the Collateral as defined in the Master Agreement to secure Geodata's Obligations under the Master Agreement.

Xynergy's contention, however, that it has "a valid and enforceable security interest over all assets of Geodata, now existing or hereafter arising" deserves close scrutiny. ECF No. 143, at 18-19. On February 28, 2014, a U.C.C. financing statement was filed at the Department of State

22

of Puerto Rico by Xynergy. ECF No. 143-1, at 7, ¶ 30; ECF No. 143-13, at 1. The financing statement described Geodata as the debtor and Xynergy as the secured party and it indicated that it covered all assets of the debtor, now existing and hereafter arising, wherever located and described. ECF No. 143-1, at 7, ¶ 30; ECF No. 143-13, at 1. "The case law makes it abundantly clear that a financing statement is intended merely to put a searcher on notice that an underlying security agreement may be outstanding.'" In re Cushman Bakery, 526 F.2d 23, 29 (1st Cir. 1975) (citations omitted); In Re Numeric Corp., 485 F.2d 1328, 1331-32 (1st Cir. 1973) ("the function of a financing statement is merely to put third parties on notice that the secured party who has filed it may have a perfected security interest in the collateral described.").

A financing statement is not a substitute for a security agreement. See In re Levitz Ins. Agency, 152 B.R. 693, 698 (Bankr. D. Mass. 1992); Shelton v. Erwin, 472 F.2d 1118, 1120 (8th Cir. 1973) ("The financing statement is merely evidence of the creation of a security interest, not the agreement itself."); In re Florida Bay Trading Co., 177 B.R. 374, 382 (Bankr. M.D. Fla. 1994) ("Unlike the security agreement, a financing statement was not designed to create a security interest but to perfect the interest already attached."). "Where a security agreement covers only certain assets, the financing statement's inclusion of additional assets is ineffective to create a security interest in the additional assets omitted from the security agreement." See In re Levitz Ins. Agency, 152 B.R. at 698.

In the case at hand, the mere fact that Xynergy filed a financing statement indicating that it covered all assets of Geodata is insufficient to create a security interest in all assets of Geodata. Id. Xynergy's security interest in this case arises from the security agreement which includes the Collateral defined in the Master Agreement. The financing statement here perfects Xynergy's security interest in the Collateral contemplated by the Master Agreement as it put a "searcher on

notice that an underlying security agreement may be outstanding." <u>In re Cushman Bakery</u>, 526 F.2d at 29. Therefore, Xynergy's security interest to secure Geodata's Obligations under the Master Agreement is limited to the Collateral as defined in the Master Agreement.

The next step of the analysis is whether Geodata breached its Obligations under the Master Agreement. Under the Master Agreement, Geodata agreed not to impede or interfere with Xynergy's collection of any purchased accounts. ECF No. 143-1, at 6, ¶ 26; ECF No. 143-10, at 10, ¶ 8(d)(vi). Additionally, Geodata was required to notify Third Party Obligors of Non-Governmental Accounts that all proceeds paid with respect to the accounts sold to Xynergy, be sent exclusively to Xynergy's lockbox. ECF No. 143-1, at 7, ¶ 29; ECF No. 143-10, at 4, ¶ 4.2(a). Thus, it follows that Geodata breached its obligations under the Master Agreement when it informed the Municipality that the Master Agreement and the assignment of present and future accounts receivable was null and void *ab initio* and instructed the Municipality to make all payments pursuant to its service agreement with the Municipality only in favor of Geodata. ECF No. 143-18; ECF No. 143-19. Therefore, Xynergy may properly use its security interest in the Collateral to secure Geodata's Obligations under the Master Agreement.

### C. Whether the Autonomous Municipalities Act Applies to the Master Agreement

The Municipality argues that even if Chapter 9 applies to the Master Agreement, the Notice of Assignment was not effective because it did not comply with the notice requirements under Title 21, Annotated Law of Puerto Rico, Section 4001, et. seq. ("the Autonomous Municipalities Act of Puerto Rico"). ECF No. 152, at 9. The Autonomous Municipalities Act of Puerto Rico ("AMA") states "[t]he obligation and disbursement of municipal public funds shall only be done to commit or pay for services, supplies of materials and equipment, claims or any

other items authorized by laws, ordinance or resolution approved to such effects and by the regulations adopted by virtue thereof." 21 L.P.R.A. § 4354. As such,

> all disbursements made by the municipality shall be made directly to the persons or entities that rendered the services or furnished the supplies or materials, except in those cases that there is a contract for the assignment of the credit and the regulatory requirements of the Commissioner have been met.

Id. at § 4354(d). The Municipality alleges that while the AMA recognizes the assignment of credits, they must follow the notice requirements set forth in Regulation No. 8873. ECF No. 152, at 9.

Under Regulation No. 8873, a municipality may issue payment in favor of a non-supplier "only when the amounts to be paid by the municipality are assigned or transferred through a contract executed before a Notary Public or any other official authorized to effect or recognize deeds and certificates." See ECF No. 33-1, at 4-6 (Regulation No. 8873, Chapter IV, Section 10, paragraph 8).[7] The assignment contract shall contain: (1) complete names and addresses for the assignor and assignee; (2) effective date of the assignment contract; (3) number and amount of the purchase order or contract services that give rise to assignment; and (4) indicate whether the assignment is total or partial. If it is partial, it will provide the amount subject to assignment. Id. The Municipality argues that the Notice of Assignment is invalid because it was not executed before a notary public. ECF No. 152, at 11.

Xynergy, on the other hand, refutes the applicability of Regulation No. 8873 by pointing out that it expressly sets forth the following: "[t]his Regulation applies to all Puerto Rico municipalities . . . except for those provisions that clearly state otherwise. However, it shall not

---

[7] Both parties cite to portions of Regulation No. 8873 in their memorandums of law regarding the motion for summary judgment. ECF No. 143, at 9; ECF No. 152, at 9. Regulation No. 8873 has not been tendered as an exhibit by either party for this motion for summary judgment. However, no party is disputing the accuracy of the certified translations of portions of Regulation No. 8873 that were tendered as exhibits on a motion to dismiss. See ECF Nos. 33-1; 44-1.

apply in cases where a special law contains provisions that are contrary to those specified therein." <u>See</u> ECF No. 44-1, at 2-3 (Regulation No. 8873, Chapter I, Section 4). It is alleged by Xynergy that Chapter 9 is a special law that regulates "the enforcement and validity of an assignment of credits under Chapter 9, which also promulgates the proper form and requirements for notices of assignment, on its own terms." ECF No. 143, at 9.

Under the law of Puerto Rico, "according to the general rules of construction of statutes, a special law governing a specific matter prevails over a general law." <u>See</u> <u>Cordova & Simonpietri v. Crown American</u>, 12 P.R. Offic. Trans. 1003, 1007 (P.R. 1982). In the case at hand, Chapter 9 of Puerto Rico's Commercial Transactions Act is a special law that applies to transactions that create a security interest in a sale of accounts. <u>See</u> 19 L.P.R.A. 2219(a); <u>In re Allied Financial, Inc.</u>, 616 B.R. 1, 5-6 (Bankr. D.P.R. 2020) ("the Commercial Transactions Act is a special law that governs negotiable instruments and it prevails over a general law"); <u>In Re Manuel Mediavilla, Inc.</u>, 505 B.R. 94, 104 (Bankr. D.P.R. 2014) (noting that the Commercial Transactions Act is a special commercial law). "In matters which are the subject of special laws, any deficiency in such law is supplemented by the Puerto Rico Civil Code. As such, the Puerto Rico Civil Code acts as a supplement to the Commercial Transactions Act in areas where this statute is deficient." <u>In re Allied Financial, Inc.</u>, 616 B.R. at 5-6.

Chapter 9 sets forth the specific requirements for an authenticated notification to be effective to inform an account debtor that the amount due has been assigned. <u>See</u> 19 L.P.R.A. § 2306(a). The authenticated notification must indicate that (1) "that the amount due or to become due has been assigned" and (2) "that payment is to be made to the assignee." <u>Id</u>. at § 2306(a). Thus, because Chapter 9 provides the specific requirements for an authenticated notification, there is no deficiency that needs to be supplemented. The Municipality contends

that even if Chapter 9 is a special law, the public notary requirement in Regulation No. 8873 is not onerous and does not impose a burden or constitute an obstacle. ECF No. 152, at 13. However, Regulation No. 8873 does impose contrary notice requirements because the public notary requirement is absent from Chapter 9. Compare ECF No. 33-1, at 4-6 (Regulation No. 8873, Chapter IV, Section 10, paragraph 8), with 19 L.P.R.A. § 2306(a).

In the case at hand, the Notice of Assignment is an effective authenticated notification because it complied with Chapter 9's notice provisions. The AMA and Regulation No. 8873's notice requirements do not apply to the Master Agreement because Chapter 9 is a special law that applies to these transactions and Regulation No. 8873 has contrary notice provisions. Furthermore, Chapter 9 also specifically provides that "[t]he provisions of the Civil Code of Puerto Rico with respect to pledges and transmissions of credits shall not apply to transactions governed by this chapter." 19 L.P.R.A. § 2219(e).

Even assuming arguendo that Regulation No. 8873 did apply to the Master Agreement, the Municipality's argument that the Notice of Assignment is ineffective is undercut at this juncture by the fact that after the Municipality received the Notice of Assignment, from the year 2014 and up to June 20, 2018, in relation to the services rendered by Geodata to the Municipality, the Municipality paid to the order of both Geodata and Xynergy, the amount of $18,668,682.62. ECF No. 143-25, at 6, ¶ 13. See Rosemount Global Trade v. AJC Int'l, Inc., Civ. No. 11-112, 2011 WL 13217820, at *4 (N.D. Ga. Oct. 25, 2011) (explaining that "[s]tandard contract law would prevent [an account debtor] from challenging the notification of the assignment's sufficiency once it has accepted the notification and in particular, after it has made several payments."); Florida First Nat. Bank v. Fryd Constr. Corp., 245 So. 2d 883, 886 (Fla. Ct. App. 1971) ("Having agreed by his actions as to the binding effect of the notice he may

not at this date disavow the notice and label his own actions as illegal."); 4 White & Summers,

Uniform Commercial Code, § 34-14 (6th ed. 2019) ("even if the notice is insufficient by

objective standards, if the account debtor acts as if due notification has been made, as by

accepting the notification and making several payments to the assignee, the account debtor will

be estopped from asserting the insufficiency of the notification.").

### D. Whether the Service Agreement between Geodata and Municipality Affects the Assignment of the Disputed Invoices

Next, the Municipality alleges the service agreement between the Municipality and

Geodata prohibited their obligations from being assigned under said contract. ECF No. 152, at

10; ECF No. 152-2, at 31, ¶ 6.16 ("[Geodata] may not subcontract, assign or in any other manner

transfer the rights and obligations specified in this Contract, without the proper express and

written authorization of an officer authorized by the Municipality."). The Municipality's

argument is untenable because the service agreement between Geodata and the Municipality is

irrelevant for purposes of determining whether the Municipality is obligated to pay the amount of

the Disputed Invoices to Xynergy under Chapter 9 pursuant to the Notice of Assignment. The

question in the case at hand is not whether Geodata breached its service agreement with the

Municipality. Chapter 9 specifically provides that

> a term in an agreement between an account debtor and an assignor or in a
> promissory note is ineffective to the extent that it:
>
> (1) Prohibits, restricts, or requires the consent of the account debtor or person
> obligated on the promissory note to the assignment or transfer of, or the creation,
> attachment, perfection, or enforcement of a security interest in, the account, chattel
> paper, payment intangible, or promissory note, or
>
> (2) provides that the assignment or transfer or the creation, attachment, perfection,
> or enforcement of the security interest may give rise to a default, breach, right of
> recoupment, claim, defense, termination, right of termination, or remedy under the
> account, chattel paper, payment intangible, or promissory note.

19 L.P.R.A. § 2306(d).

Therefore, under the plain language of Chapter 9, the provision in the service assignment that prohibits assignments without the proper express and written authorization from the Municipality is rendered "ineffective" for being an anti-assignment clause. See id.; ImagePoint, Inc. v. JP Morgan Chase Bank, Nat. Ass'n, 27 F. Supp. 3d 494, 509 (S.D.N.Y. 2014) (explaining that an anti-assignment clause in a procurement agreement was rendered ineffective under New York's version of the U.C.C.). Moreover, as previously stated, the Municipality's argument is also severely undermined because the record evidence reflects that after the Municipality received the Notice of Assignment, from the year 2014 and up to June 20, 2018, in relation to the services rendered by Geodata to the Municipality, the Municipality paid to the order of both Geodata and Xynergy, the amount of $18,668,682.62. ECF No. 143-25, at 6, ¶ 13.

### E. Whether the Notice of Assignment Contemplated All of the Contracts Between the Municipality and Geodata

The Municipality alleges that even if the Notice of Assignment was deemed effective, then it could only affect the contract that was in full force on February 20, 2014. ECF No. 152, at 13. At the time it received the Notice of Assignment on February 20, 2014, contract number 2014-001545 was in effect. ECF No. 143-8; ECF No. 146-4, at 3, ¶ 6. Contract number 2014-001545 was terminated on April 22, 2014. ECF No. 146-4, at 3, ¶ 7. Thus, the Municipality claims that it is not obligated to pay Xynergy any monies except for those invoices arising under contract number 2014-001545 because the Disputed Invoices arose under different contracts and it never received any notices of assignment regarding the subsequent contracts. ECF No. 152, at 15.

Through the Notice of Assignment, Geodata informed the Municipality that it had assigned its present and future accounts receivable to Xynergy and instructed the Municipality to

remit all payments for all of its accounts receivable to Xynergy until notified otherwise by Xynergy only. ECF No. 143-8, at 1. The Notice of Assignment does not reference any contract number. Id. The Notice of Assignment also does not qualify that it only applied to the contract that was currently in effect between Geodata and the Municipality. Id. The Notice of Assignment simply provides that Geodata "assigned its present and future accounts receivable to [Xynergy]" and instructed the Municipality to "remit all payments for all accounts receivable from Geodata payable to [Xynergy]." Id. Therefore, even if Geodata and the Municipality entered into new contracts, the Notice of Assignment was still effective because it was for its present and future accounts receivable to Xynergy. Id.

Furthermore, "[o]nce an account debtor has notice of an assignment, if it has any questions, standard Uniform Commercial Code principles require the account debtor to contact the assignee for clarification. It cannot simply stop paying the assignee without asking." Rosemount Global Trade Finance Fund, L.P. v. AJC International, Inc., Civ. No. 11-112, 2011 WL 13217820, at *5 (N.D. Ga. Oct. 25, 2011); Greenfield Commercial Credit, L.L.C. v. Catlettsburg Refining, L.L.C., Civ. No. 3-3391, 2007 WL 97068, at *3 (E.D. La. Jan. 9, 2007) ("when an account debtor . . . doubts the adequacy of the notice of assignment, the onus is on it to contact the assignee—not the assignor—concerning the alleged insufficiency of the notice."); King v. Tuxedo Enterprises, Inc., 975 F. Supp. 448, 453 (E.D.N.Y. 1997) ("If the account debtor doubts the adequacy of the notification or the validity of the assignment, he or she may not disregard the notice, but must request the assignee to furnish reasonable proof that the assignment has been made."). In the case at hand, no evidence has been presented that the Municipality, the account debtor, asked Xynergy, the assignee, for clarification regarding which accounts were assigned under the Notice of Assignment. If the Municipality had any doubts

about the meaning of "present and future accounts" in the Notice of Assignment, it had the obligation to contact Xynergy regarding the scope of the assignment. No further inquiry was made by the Municipality and that failure is fatal to its contention that the Notice of Assignment only applied to the contract that was in full force on February 20, 2014. See Greenfield Commercial Credit, L.L.C., 2007 WL 97068 at *3.

The Municipality's argument is further undercut given that after the Municipality received the Notice of Assignment, from the year 2014 and up to June 20, 2018, in relation to the services rendered by Geodata to the Municipality, the Municipality paid to the order of both Geodata and Xynergy the amount of $18,668,682.62. ECF No. 143-25, at 6, ¶ 13; ECF No. 143-20, at 7-8, ¶ 5; ECF No. 152-1, at 17, ¶ 31.

**F. Whether Xynergy is Entitled to Payment of the Disputed Invoices Because Xynergy is Not Mentioned in the Contracts between Geodata and the Municipality**

The Municipality also argues that Xynergy is not entitled to payment on the Disputed Invoices because the contracts between the Municipality and Geodata that covered the dates of the Disputed Invoices did not "make reference to any third party" or "mention Xynergy or any assignment related to Xynergy." ECF No. 152, at 14. The Municipality's argument confuses the issue. It is irrelevant for purposes of the pending motion at hand whether the contracts between Geodata and the Municipality mandate payment on the Disputed Invoices to Xynergy. Instead, the focus should be placed on the fact that under the Notice of Assignment, the Municipality, as an account debtor, was required to pay the amounts due on the Disputed Invoices to Xynergy, as the secured party. ECF No. 143, at 17; see 19 L.P.R.A. § 2306(a).

**G. Xynergy's Remedy Under Chapter 9**

Under Chapter 9, "a secured party: (1) may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial

31

procedure, and (2) if the collateral is documents, may proceed either as to the documents or as to the goods they cover." 19 L.P.R.A. § 2361(a). Further, "the security interest shall continue when the secured party has reduced its claim to judgment, and shall secure the judgment without interruption whether or not the security interest is expressly recognized in the judgment, except to the extent the judgment expressly provides to the contrary." 19 L.P.R.A. § 2361(e). If so agreed, and in any event after default, a secured party

> (1) May notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party;
> (2) may take any proceeds to which the secured party is entitled under § 2265 of this title;
> (3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral.

19 L.P.R.A. § 2367(a)(1)-(3).

Under the Master Agreement, Xynergy was granted a security interest in all the Collateral to secure Geodata's Obligations and authorized to file a financing statement. ECF No. 143-10, at 9, ¶ 8(a); ECF No. 143-10, at 12, ¶ 9(b). On February 28, 2014, Xynergy filed a U.C.C. financing statement that covered all the assets of Geodata. See ECF No. 143-13, at 1. Geodata also granted to Xynergy the right to notify Geodata's third party obligors to make direct payments on the purchased accounts to Xynergy. ECF No. 143-10, at 10, ¶ 8(b); ECF No. 143-10, at 12, ¶8 (p). Thus, Xynergy is entitled to enforcement of all applicable remedies available to a secured party pursuant to Chapter 9.

Lastly, the Municipality argues it is not required to pay the amount of the Disputed Invoices to Xynergy because its obligations became extinguished when it paid the amount of the Disputed Invoices to Geodata. ECF No. 152, at 15. As stated earlier, Chapter 9 establishes that

"an account debtor on an account . . . may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee." 19 L.P.R.A. § 2306(a). After an account debtor has received an authenticated notification, "the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." Id.

Thus, it follows that after the Municipality received the Notice of Assignment on February 20, 2014, it could only discharge its obligations by paying Xynergy. See ARA Inc. v. City of Glendale, 360 F. Supp. 957, 967 (D. Ariz. 2019) ("Generally, an account debtor who disregards directions to pay the assignee and instead pays the assignor remains liable to the assignee."); Durham Commercial Capital Corp. v. Owen Loan Servicing, LLC, Civ. No. 15-80200, 2015 WL 4164780, at *4 (S.D. Fla. 2015) (citations omitted) ("a debtor who receives actual notice of the assignment of an account receivable or an obligation to pay may be held liable to the assignee if the debtor later pays the assigned debt to the assignor rather than the assignee."); Pacific Bus. Capital Corp. v. Time Warner Cable, LLC, Civ. No. 9-5188, 2012 WL 2970490, at *2 (C.D. Cal. July 20, 2012) ("an account debtor who ignores the notification of assignment and continues to pay the assignor is not relieved of its obligation to pay the assignee and will be subject to liability to the assignee for any payments made to the assignor."); Greenfield Commercial Credit, L.L.C. v. Catlettsburg Refining, L.L.C., Civ. No. 3-3391, 2007 WL 97068, at *3 (E.D. La. Jan. 9, 2007) ("It is well established that an account debtor who fails to comply with a valid assignment and improperly pays the assignor may be liable to the assignee for the amount of the improper payment."). Therefore, the Municipality's argument is

unfounded as its payment of the amount of the Disputed Invoices to Geodata did not discharge

its obligations under Chapter 9 to pay the amount of the Disputed Invoices to Xynergy.

V.      **Conclusion**

For the foregoing reasons, there being no material issues of fact in controversy, the

request by Xynergy in the motion for summary judgment that the Municipality be found liable to

Xynergy in the amount of $1,019,499.19 for its failure to discharge its payment obligations

regarding the Disputed Invoices is GRANTED.[8]

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 29th day of January, 2021.

s/Marcos E. López      
U.S. Magistrate Judge

---

[8] The other requests by Xynergy in the motion for summary judgment will be addressed once all dispositive motions have been ruled upon.