### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| XYNERGY HEALTHCARE CAPITAL II LLC, <br><br> Plaintiff, <br><br> v. <br><br> MUNICIPALITY OF SAN JUAN, et al. <br><br> Defendants. | CIVIL NO.: 18-1208 (MEL) |

## OPINION AND ORDER

### I.    Procedural Background

Xynergy Healthcare Capital II LLC ("Xynergy") filed an amended complaint against the Municipality of San Juan ("the Municipality" or "MSJ") and GEODATAPR International, Inc. ("Geodata") on August 26, 2018. ECF No. 20. In the amended complaint, Xynergy alleges that Geodata is liable to Xynergy for breach of contract damages under the Healthcare Receivables Master Purchase and Sale Agreement ("Master Agreement"). Id. at 11-12, 15-16. It is also alleged by Xynergy that it has a valid and enforceable security interest over all assets of Geodata. Additionally, Xynergy seeks a declaratory judgment that the Municipality and Geodata are jointly and severally liable for certain unpaid payment obligations under the Master Agreement and Chapter 9 of Title 19, Annotated Laws of Puerto Rico, Section 2211, et. seq. ("the Commercial Transactions Act"). Id. at 11, 15-16.

On September 14, 2018, the Municipality filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 35. The Municipality's motion to dismiss was denied on September 19, 2019. ECF No. 136. The Municipality answered the

complaint on September 26, 2019. ECF No. 138. Pending before the court is a motion for summary judgment filed by the Municipality against Xynergy. ECF No. 146. The Municipality alleges, among other allegations, that it is not obligated to pay the outstanding amount of certain accounts receivable to Xynergy. Id. at 9-13. Xynergy subsequently filed a response in opposition. ECF No. 151.

## II.   Standard of Review

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992) (citations omitted). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). For issues where the nonmoving party bears the ultimate burden of proof, the party cannot merely "rely on an absence of competent evidence, but must affirmatively point to specific facts

[in the record] that demonstrate the existence of an authentic dispute." McCarthy v. Nw.

Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citation omitted). The party need not, however,

"rely only on uncontradicted evidence . . . . So long as the [party]'s evidence is both cognizable

and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to

determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of

Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original) (citation omitted).

In assessing a motion for summary judgment, the court "must view the entire record in

the light most hospitable to the party opposing summary judgment, indulging all reasonable

inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115. There is "no room for credibility

determinations, no room for the measured weighing of conflicting evidence such as the trial

process entails, [and] no room for the judge to superimpose his own ideas of probability and

likelihood." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The

court may, however, safely ignore "conclusory allegations, improbable inferences, and

unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.

1990) (citations omitted).

## III.    Uncontested Material Facts[1]

In early 2014, Geodata entered into a contract with the Municipality to perform

"the billing, reconciliation personnel and the collection of the medical-hospital services"

rendered by the Municipality. ECF No. 146-6, at 9, ¶ 2.2. The scope of services provided by

Geodata under the contract included in pertinent part: admissions, pre-certification and

authorization, billing to medical plans (paper and electronic), claims and follow-up, Medicare

---

[1] Local Rule 56(e) provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."

reports necessary with medical plans, and technical direction related to billing systems and procedures of health services and the infrastructure that facilitates said services. Id. at 13-14, ¶¶ 3.13-3.20. Geodata was compensated for its services by billing monthly invoices to the Municipality. Id., at 20-23, ¶¶ 5.2, 5.5.

The Municipality and Geodata executed various contracts and the corresponding amendments:

1.   Contract number 2014-001545, dated January 31, 2014.
2.   Amendment to the Professional Services Contract Number 2014-001545, dated February 24, 2014.
3.   Amendment Z to Contract Number 2014-001545, dated April 22, 2014.
4.   Contract number 2014-001928, dated April 22, 2014.
5.   Contract number 2015-000408, dated July 1, 2014.
6.   Contract number 2016-000669, dated June 30, 2015.
7.   Contract number 2016-000669A, dated December 17, 2015 (Amendment).
8.   Contract number 2016-000669B, dated April 19, 2016 (Amendment).
9.   Contract number 2017-000399, dated June 21, 2016.
10.  Contract number 2017-000399A, dated August 1, 2016 (Amendment).
11.  Contract number 2017-000399B, dated December 30, 2016 (Amendment).
12.  Contract number 2017-000399C, dated March 10, 2017 (Amendment).
13.  Contract number 2017-000399D, dated June 22, 2017 (Amendment).
14.  Contract number 2018-000682, dated July 12, 2017.
15.  Contract number 2018-000682A, dated September 1, 2017 (Amendment).
16.  Contract number 2018-000682B, dated May 2, 2018 (Amendment).
17.  Contract number 2018-000682C, dated April 27, 2018 (Amendment).
18.  Contract number 2018-000682D, dated June 30, 2018 (Amendment).
19.  Contract number 2018-000682E, dated November 2, 2018 (Amendment).
20.  Contract number 2018-000682F, dated December 21, 2018 (Amendment).

ECF No. 146-1, at 1-2, ¶ 1; ECF No. 151-1, at 1, ¶ 1.

On February 14, 2014, the Municipality received a Notice of Perpetual Assignment and Change of Payee ("Notice of Assignment") signed by Xynergy and Geodata. ECF No. 146-1, at 2, ¶ 2; ECF No. 151-1, at 1, ¶ 2. The Notice of Assignment informed the Municipality that Geodata assigned its present and future accounts receivable to Xynergy and instructed the Municipality to remit all payments for Geodata's accounts receivable to Xynergy until notified

4

otherwise by Xynergy only. ECF No. 146-11. Accordingly, on February 25, 2014, Geodata and Xynergy entered into the Master Agreement. ECF No. 146-9. The purpose of the Master Agreement was for the sale of Geodata's accounts receivable to Xynergy that came from the billing and collection services provided to the Municipality. ECF No. 146-9, at 1; ECF No. 151-2, at 5, ¶ 14.

The contract that was in full force between the Municipality and Geodata on the date in which the Notice of Assignment was submitted to the Municipality was contract number 2014-001545. ECF No. 146-1, at 3, ¶ 4; ECF No. 151-1, at 1, ¶ 4. Contract number 2014-001545 was terminated by the Municipality on April 22, 2014 through Amendment Z. ECF No. 146-1, at 3, ¶ 5; ECF No. 151-1, at 1, ¶ 5. For the rest of the contracts listed above, a notice or other type of document that could evidence assignment of accounts receivables between Geodata and Xynergy corresponding to the payments related to services during the effective dates of such instruments was not found. ECF No. 146-1, at 3, ¶ 6; ECF No. 151-1, at 1, ¶ 6.

In the case at hand, Xynergy is claiming that the Municipality owes Xynergy monies related to the following invoices: (1) 2017-015; (2) 2017-016; (3) 2017-017; (4) 2017-018; (5) 2017-019; (6) 2017-020; (7) 2017-021; (8) 2017-022; (9) 2017-023; (10) 2017-024; (11) 2018-001; (12) 2018-002; (13) 2018-003; and (14) 2018-004. ECF No. 146-1, at 3, ¶ 7; ECF No. 151-1, at 1, ¶ 7. The information pertaining to those invoices is as follows:

| Invoice number | Period covered | Amount |
|---|---|---|
| 2017-015 | August 1-15, 2017 | $47,116.96 |
| 2017-016 | August 16-31, 2017 | $40,536.64 |
| 2017-017 | September 1-15, 2017 | $37,258.29 |

| 2017-018 | September 16-30, 2017 | $27,985.31 |
| 2017-019 | October 1-15, 2017 | $42,478.54 |
| 2017-020 | October 16-31, 2017 | $45,175.06 |
| 2017-021 | November 1-15, 2017 | $49,161.97 |
| 2017-022 | November 16-30, 2017 | $38,491.63 |
| 2017-023 | December 1-15, 2017 | $48,250.05 |
| 2017-024 | December 16-31, 2017 | $40,654.82 |
| 2018-001 | January 1-15, 2018 | $38,069.73 |
| 2018-002 | January 16-31, 2018 | $52,689.26 |
| 2018-003 | February 1-15, 2018 | $47,936.74 |
| 2018-004 | February 16-28, 2018 | $39,943.09 |

ECF No. 146-1, at 3-4, ¶ 8; ECF No. 151-1, at 2, at ¶ 8.

All of the invoices listed above correspond to services provided by Geodata for the period of August 1, 2017 through February 28, 2018. Therefore, the contracts between the Municipality and Geodata that cover those invoices are contract number 2018-000682 and contract number 2018-00682A. ECF No. 146-1, at 4, ¶ 9; ECF No. 151-1, at 2, ¶ 9; ECF No. 146-1, at 1-2, ¶ 1. Contract number 2018-000682 and its amendments were signed only by the Municipality and Geodata. ECF No. 146-1, at 4, ¶ 10; ECF No. 151-1, at 2, ¶ 10. Neither contract number 2018-000682 nor its amendments make reference to any third party. ECF No. 146-1, at 4, ¶ 11; ECF No. 151-1, at 2, ¶ 11. Contract number 2018-00682 nor its amendments mention Xynergy or any assignment related to Xynergy. ECF No. 146-1, at 4, ¶ 12; ECF No. 151-1, at 2, ¶ 12. The Municipality does not have a contract with Xynergy. ECF No. 146-1, at 4, ¶ 13; ECF No. 151-1,

6

at 2, ¶ 13. The Municipality paid the following invoices to the order of Geodata only: (1) 2017-015; (2) 2017-016; (3) 2017-017; (4) 2017-018; (5) 2017-019; (6) 2017-020; (7) 2017-021; (8) 2017-022; (9) 2017-023; (10) 2017-024; (11) 2018-001; (12) 2018-002; (13) 2018-003; and (14) 2018-004. ECF No. 146-1, at 4-5, ¶ 14; ECF No. 151-1, at 2, ¶ 14.

Xynergy also claims to be entitled to monies related to four additional invoices: (1) 1-2017-Cont; (2) 2-2017-Cont; (3) 2017-13; and (4) 2017-14. ECF No. 146-1, at 5, ¶ 15; ECF No. 151-1, at 2, ¶ 15.[2] The information pertaining to those invoices is as follows:

| Invoice number | Period Covered | Amount |
|---|---|---|
| 1-2017-Cont | January 1-31, 2017 | $310,085.11 |
| 2-2017-Cont | February 1-28, 2017 | $338,575.72 |
| 2017-13 | July 1-15, 2017 | $39,166.04 |
| 2017-14 | July 15-31, 2017 | $39,008.55 |

ECF No. 146-1, at 5-6, ¶ 16; ECF No. 151-1, at 2, ¶ 16.

The invoices 1-2017-Cont and 2-2017-Cont correspond to services provided by Geodata for the periods of January 1, 2017 to February 28, 2017. ECF No. 146-1, at 6, ¶ 17; ECF No. 151-1, at 2, ¶ 17. The contract between the Municipality and Geodata that covers the invoices for January 1, 2017 to February 28, 2017 is contract number 2017-000399B (Amendment B to contract number 2017-000399). ECF No. 146-1, at 6, ¶ 18; ECF No. 151-1, at 2, ¶ 18. Contract number 2017-000399 and its amendments were signed only by the Municipality and Geodata. ECF No. 146-1, at 6, ¶ 19; ECF No. 151-1, at 2, ¶ 19. Neither contract number 2017-000399 nor its amendments make reference to any third party. ECF No. 146-1, at 6, ¶ 20; ECF No. 151-1, at

---

[2] Invoice 1-2017-Cont does not appear among the invoices claimed by Xynergy in its motion for summary judgment against the Municipality. See ECF No. 143-1, at 8-10, ¶¶ 33-35.

2, ¶ 20. Contract number 2017-000399 nor its amendments mention Xynergy or any assignment related to Xynergy. ECF No. 146-1, at 6, ¶ 21; ECF No. 151-1, at 2, ¶ 21. The invoices 2017-13 and 2017-14 correspond to services provided by Geodata for the periods of July 1, 2017 to July 31, 2017. ECF No. 146-1, at 6, ¶ 17; ECF No. 151-1, at 2, ¶ 17. Contract number 2018-000682 covers the invoices for July 1, 2017 to July 31, 2017.[3] Id.

Contract numbers 2017-000399 and 2018-00682 contain identical hold-harmless agreement clauses which state that Geodata

> will relieve the Municipality of any liability in the event of any claim, dispute, lawsuit, complaint, or action that is related to the services object of this Contract by third parties, including agents, representatives, employees or officers of the parties. This exemption and relief shall be interpreted in the most reasonable way possible for the Municipality, including the relief of payment of judgment, penalty, fine, interest, or transaction, as well as the expenses of litigation fees, costs, and attorneys' fees. The Municipality will not be liable, direct or indirectly, for any loss or damage that may be suffered by any natural or legal person for the services or operations according to this Contract, irrespective of that it can be argued that the Municipality is liable for them.

ECF No. 146-1, at 6-7, ¶ 22; ECF No. 151-1, at 2, ¶ 22. The records of the Municipality reflect that a payment was made to the order of both Geodata and the Xynergy for Invoice 1-2017-Cont. ECF No. 146-1, at 7, ¶ 23; ECF No. 151-1, at 2, ¶ 23. The records of the Municipality also reflect that payments were made on Invoices 2-2017-Cont, 2017-13, and 2017-14 to the order of only Geodata. Id.

On or around March 28, 2018, through a legal representative, Geodata sent a letter to the Municipality dated March 28, 2018, stating that the Master Agreement and the assignment of

---

[3] It is undisputed by the parties that contract number 2018-000682 covers the invoices for July 1, 2017 to July 31, 2017. ECF No. 146-1, at 6, ¶ 17; ECF No. 151-1, at 2, ¶ 17. It is also undisputed by the parties that contract number 2018-000682 is dated July 12, 2017. ECF No. 146-1, at 2, ¶1; ECF No. 151-1, at 1, ¶ 1. No explanation has been given to clarify how contract number 2018-000682 covers the invoices from July 1, 2017 to July 11, 2017 even though it is dated July 12, 2017.

present and future accounts receivable was null and void *ab initio*. ECF No. 146-7. In the letter, Geodata instructed the Municipality to make all payments pursuant to its service agreement with the Municipality payable only in favor of Geodata. Id. Geodata's legal representative sent another letter dated April 24, 2018, reiterating the request to make all payments pursuant to its service agreement with the Municipality, payable only in favor of Geodata. ECF No. 146-8; ECF No. 146-1, at 2, ¶ 24; ECF No. 151-1, at 2, ¶ 24.

## IV.    Analysis

The Municipality contends that Chapter 9 of the Commercial Transactions Act does not apply to invoices 2017-015; 2017-016; 2017-017; 2017-018; 2017-019; 2017-020; 2017-021; 2017-022; 2017-023; 2017-024; 2018-001; 2018-002; 2018-003; 2018-004; 1-2017-Cont; 2-2017-Cont; 2017-13; and 2017-14 ("Disputed Invoices") that are claimed by Xynergy for being an assignment of accounts which is for collection purposes only. ECF No. 146, at 13. The Municipality also claims that the Notice of Assignment is ineffective because it does not comply with the Autonomous Municipalities Act or related regulations. Id. at 14. It is further alleged by the Municipality that it cannot be burdened by the Master Agreement which is a contract between Geodata and Xynergy. Id. at 19. Lastly, the Municipality argues that the case against it should be dismissed because a hold-harmless agreement exists between the Municipality and Geodata. Id. at 24-25.

### A. Whether Chapter 9 Applies to the Master Agreement

In 2012, Puerto Rico's Commercial Transactions Act was amended to adopt several sections of Article 9 of the U.C.C. See In Re Cruz Rivera, 600 B.R. 132, 146 (1st Cir. B.A.P. 2019). Article 9 of the U.C.C. provides "a comprehensive scheme for the regulation of security interests in personal property and fixtures." U.C.C. § 9-101 (Am. Law Inst. & Unif. Law

9

Comm'n 2017). Under the revised Commercial Transactions Act, Chapter 9 applies to "a sale of accounts, chattel paper, payment intangibles, or promissory notes." 19 L.P.R.A. § 2219(a). [4] Accounts means "a right to payment of a monetary obligation, whether or not earned by performance, for services rendered or to be rendered." 19 L.P.R.A. § 2212(a)(2)(iii). In the case at hand, Geodata's accounts receivable contemplated by the Master Agreement and accompanying term sheets are accounts under Chapter 9 because they are related to Geodata's rights to payment of monetary obligations from the Municipality for services Geodata rendered to the Municipality for its medical collection and billing services.

The next step of the analysis is whether the transaction in the Master Agreement was for a sale or a loan. Courts consider a common set of elements in determining whether a particular transaction constitutes a sale or a loan. In re Burm, 554 B.R. 5, 17 (Bankr. D. Mass. 2016). These factors include (1) the intent of the parties; (2) whether the seller's creditors are notified that payments are to be made to the buyer of the accounts and/or whether the buyer takes responsibility for account collection; and (3) whether the transaction is non-recourse. Id.

In the case at bar, an examination of the Master Agreement within the context of these factors leads to a determination that the contract between Geodata and Xynergy was for the sale of accounts receivable. See ECF No. 146-9. First, the parties clearly intended the Master Agreement to be for the sale of accounts receivable. The Master Agreement states that Geodata "shall treat transfers to [Xynergy] of Purchased Accounts hereunder as a sale for all purposes." ECF No. 146-9, at 10, ¶ 8(d)(i). It describes Geodata and Xynergy's "mutual intent . . . that the purchase of any Purchased Account is, as intended by the parties to be a true sale." Id. at 12,

---

[4] The U.C.C. refers to its section regarding secured transactions as "Article 9" whereas the Commercial Transactions Act refers to its corresponding section as "Chapter 9."

¶ 9(c). The Master Agreement also emphasizes that the parties "hereunder exclusively and solely engage in the purchase and sale of Accounts, and that none of these transactions constitute a lending arrangement or a loan." Id. at 16, ¶ 16(r).

Second, the Master Agreement states that Geodata "shall take all necessary and appropriate steps, including the sending of a notice to Third Party Obligors of Non-Governmental Accounts . . . to assure that all proceeds paid with respect to all Non-Governmental Accounts . . . be sent exclusively to the Purchaser Lockbox." Id. at 4, ¶ 4.2(a). Thus, per the terms of the contract, Geodata was to instruct the Municipality to send payments directly to Xynergy.[5] Third, neither party has brought to the attention of the court any portion of the Master Agreement to show that it was recourse. For example, it has not been indicated that Geodata had to warrant the creditworthiness of the account debtors or that Xynergy did not incur the risk of non-collection of the purchased accounts. See In re Siskey Hauling Co., Inc., 456 B.R. 597, 607 (Bankr. N.D. Ga. 2011) (citing Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538, 544–45 (3d Cir. 1979)). Thus, the Master Agreement between Xynergy and Geodata was for the sale of accounts receivable.

The Municipality, however, contends that Chapter 9 does not apply to the Master Agreement because it was only for the "collection of monies." ECF No. 146, at 13. Indeed,

---

[5] According to the Master Agreement, "Accounts for which the Third Party Obligor is the United States of America or any state or any agency or Instrumentality thereof or any state which is obligated to make any payments with respect to Medicare or Medicaid Accounts or representing amounts owing under any other program established by a federal or state law which provides for payments for healthcare goods or services to be made to the Provider are hereinafter referred to as 'Governmental Accounts'; all other Accounts are sometimes hereinafter referred to as 'Non-Governmental Accounts'." ECF No. 146-9, at 1, ¶ 1. In the case at hand, the purchased accounts by Xynergy were not accounts receivable that the Municipality was required to make payments with respect to "Medicare or Medicaid Accounts or representing amounts owing under any other program established by a federal or state law which provides for payments for healthcare goods or services to be made to [Geodata]." Instead, the purchased accounts were related to the medical billing and collection services that Geodata provided to the Municipality. Id. Therefore, the accounts purchased by Xynergy from Geodata were Non-Governmental Accounts.

Chapter 9 does not apply to an assignment of accounts made for collection purposes only. See 19 L.P.R.A. § 2219(d)(5). "Because the text of the Commercial Transactions Act comes from the [U.C.C], the court has looked to equivalent statutes in other jurisdictions." In re Allied Financial, Inc., 2020 WL 2026632, 616 B.R. 1, 7 (Bankr. D.P.R. 2020).

The U.C.C.'s exclusion of the assignment of accounts made for collection purposes only "'deals with a case in which a creditor sells its accounts or other intangibles to a collection agency not for the purpose of financing but for the purpose of collection.'" See In re C.W. Min. Co., 509 B.R. 378, 386 (Bankr. D. Utah 2014) (quoting 4 White, Summers, & Hillman, Uniform Commercial Code § 30:20 (6th ed. 2019)). The exclusion of accounts for the purpose of collection only "must necessarily apply only to assignments of a non-commercial nature . . . . To hold otherwise would permit the exception to engulf the rule and directly contravene the express policy of the Code to include transfers of contract rights under Chapter 9 as security interests." In re Cawthorn, 33 B.R. 119, 120 (Bankr. M.D. Tenn. 1983); see ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n, 27 F. Supp. 3d 494, 504-05 (S.D.N.Y. 2014) (explaining that an assignment of a non-commercial nature refers to assignments "such as those to a collection agency for the sole purpose of facilitating collection of the debt ... [and] [i]t does not purport to exclude transactions generally considered financing in nature.").

In interpreting Louisiana's version of this U.C.C. provision, the Eastern District of Louisiana reasoned that "[a]n assignment is 'for collection only' where it allows an assignee to 'br[ing] suit to collect money owed to [its] assignors' and the assignee 'promised to turn over to those assignors the proceeds secured through litigation.'" SE Prop. Holdings, LLC v. Unified Recovery Group, LLC, 410 F. Supp. 3d 775, 781 (E.D. La. 2019) (citing Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 280 (2008)). Thus, the court found that a transaction that

assigns the rights, title, and interest in the assigned account is not an assignment for collection purposes only. Id.

In Matter of Biloxi Prestress Concrete, Inc., a debtor's creditor assigned an account receivable, without transferring title, to another of the debtor's creditors so that it could collect on the first creditor's behalf. 98 F.3d 204, 206-08 (5th Cir. 1996). The creditors argued that Article 9 of the U.C.C. was not applicable to the assignment of its account receivable because it was made for collection purposes only. Id. at 208. The Fifth Circuit noted that the assignee did not pay the assignor for the account and that the assignee was not entitled to "collect and keep as its own the debt owed to [the assignor], but rather to collect merely as [the assignor's] agent." Id. at 208-09. Thus, the Fifth Circuit held that Article 9 was not applicable to the transaction between the assignor and assignee because the assignment of the accounts receivable was for collection purposes only. Id. The Fifth Circuit clarified, however, that "transactions relating to the creation or perfection of security interests . . . remain subject to the provisions of Article 9, absent other controlling provisions." Id. at 208.

In the case at hand, the Municipality's contention that Chapter 9 does not apply to the Master Agreement because the assignment of accounts was for collection purposes only is unfounded. First, unlike the assignee in Biloxi who did not pay the assignor for the account, Xynergy was obligated to pay an initial down payment to Geodata of 80% of the net realizable amount for each purchased account pursuant to the Master Agreement. ECF No. 146-9, at 1, ¶ 2(a); see Matter of Biloxi, 98 F.3d at 207; see also In re Worden, 63 B.R. 721, 724 (Bankr. D.S.D. 1986) (explaining that "a 'collection only' assignment does not involve an advance of money. Rather, the money is paid only if the collection is made."). Furthermore, the Master Agreement established that after Xynergy purchased an account, Geodata's rights, title, and

interest in the purchased account automatically vested in Xynergy which is indicative that the assignment was not for collection purposes only. ECF No. 146-9, at 2, ¶ 3.1; see SE Prop. Holdings, LLC, 410 F. Supp. 3d at 781; see also In re Allied Financial, Inc., 2020 WL 2026632, 616 B.R. 1, 7 (Bankr. D.P.R. 2020) (finding that the sale of a promissory note constituted a secured transaction under Chapter 9 where the party "obtained the promissory note through an endorsement, making it the owner of the promissory note, not a collection agency that was assigned the note for collection purposes.").

In the Master Agreement, Xynergy was granted a security interest in the Collateral to secure Geodata's Obligations under the contract. ECF No. 146-9, at 12, ¶ 9(b). Furthermore, Xynergy was authorized pursuant to the Master Agreement to file financing statements under the U.C.C. listing the collateral as "[a]ll assets of [Geodata], now existing or hereafter arising, wherever located." Id. at 9, ¶ 8(a). Geodata was also obligated to "take all actions deemed by [Xynergy] as necessary or desirable to effectuate the provisions of the Master Agreement and any documents delivered hereto, to evidence, protect and perfect the assignment of the title to the Purchased Accounts and the grant of a security interest in and lien on the Accounts and to facilitate the collection of the Purchased Accounts." Id. (emphasis added). These provisions of the Master Agreement providing for the creation of a security interest in the accounts which is indicative that the assignment of Geodata's accounts receivable to Xynergy was not for purposes of collection only. See Matter of Biloxi, 98 F.3d at 208. Thus, Chapter 9 applies to the sale of accounts contemplated by the Master Agreement. See Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538 (3d Cir. 1979) (holding that Article 9 governs all transactions in accounts, including both sales of accounts and secured interests in accounts, thus even an

14

outright buyer of accounts by definition has a security interest in the accounts which it purchases); In Re Cripps, 31 B.R. 541, 543 (Bankr. W.D. Okla. 1983).

### B. Application of Chapter 9 to the Master Agreement

Chapter 9 establishes that an account debtor may discharge its obligations on an account by "paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee." 19 L.P.R.A. § 2306(a). Authenticate means "to sign; or with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." Id. at § 2212(7).[6] In order for the authenticated notification to be effective, it must indicate that (1) "that the amount due or to become due has been assigned" and (2) "that payment is to be made to the assignee." Id. at § 2306(a). "After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." Id.

Under Chapter 9, an account means "a right to payment of a monetary obligation, whether or not earned by performance;" an account debtor means "a person obligated on an account;" a debtor means "a seller of accounts;" and a secured party is "a person to which accounts have been sold." 19 L.P.R.A. §§ 2212(a)(2); (a)(3); (a)(28)(B); (a)(73)(D). In relation to the transactions relevant to this case, Geodata agreed to sell accounts receivable to Xynergy related to services that Geodata performed and invoiced to the Municipality. ECF 146-9, at 1. On February 20, 2014, Geodata and Xynergy sent the Notice of Assignment to the Municipality

---

[6] "An effective notification under subsection (a) must be authenticated. This requirement normally could be satisfied by sending notification on the notifying person's letterhead or on a form on which the notifying person's name appears. In each case the printed name would be a symbol adopted by the notifying person for the purpose of identifying the person and adopting the notification." The American Law Institute, Uniform Commercial Code, Official Text and Comments, § 9-406(a) (2017) (Official Comment 2); see Wheeling & Lake Erie Ry. Co. v. Maine Northern Ry. Co., Civ. No. 14-325, 2015 WL 5440787, at *5 n.6 (D. Me. Sept. 15, 2015).

15

informing it that Geodata had assigned its present and future accounts receivable to Xynergy. ECF No. 146-11. The Notice of Assignment instructed the Municipality to remit all payments for all of Geodata's accounts receivable to Xynergy until notified otherwise by Xynergy only. Id. Therefore, the invoices sold by Geodata to Xynergy are "accounts;" the Municipality is an "account debtor" because it was obligated to pay the invoices; Geodata is a "debtor" because it sold the accounts receivable; and Xynergy is a "secured party" because accounts were sold to it.

In the case at hand, the Notice of Assignment is an authenticated notification because it was on Xynergy's letterhead, and it has the signatures of the assignor (Geodata) and the assignee (Xynergy). See ECF No. 146-11; 19 L.P.R.A. § 2212(7). The Notice of Assignment identified the rights assigned within because it informed that Geodata "has assigned its present and future accounts receivable" to Xynergy. ECF No. 146-11. The Notice of Assignment also instructed that the Municipality "remit all payments for all accounts receivable from Geodata payable to [Xynergy]." Id. The letter explicitly stated that "[p]ayments made to any other party other than [Xynergy] will not discharge or relieve your obligation for payments due to Geodata." Id. Therefore, the Notice of Assignment was an effective authenticated notification because it identified that all of Geodata's present and future accounts receivable were assigned to Xynergy and indicated that payments were to be made to Xynergy as the assignee. See 19 L.P.R.A. § 2306(a). Thus, under Chapter 9, after the Municipality received the Notice of Assignment on February 20, 2014, it could only discharge its obligations to pay the Disputed Invoices by paying Xynergy. See id.

### C. Whether the Autonomous Municipalities Act Applies to the Master Agreement

The Municipality argues that even if Chapter 9 applies to the Master Agreement, the Notice of Assignment was not effective because it did not comply with the notice requirements

16

under Title 21, Annotated Law of Puerto Rico, Section 4001, et. seq. ("the Autonomous

Municipalities Act of Puerto Rico"). ECF No. 146, at 14. The Autonomous Municipalities Act of

Puerto Rico ("AMA") states "[t]he obligation and disbursement of municipal public funds shall

only be done to commit or pay for services, supplies of materials and equipment, claims or any

other items authorized by laws, ordinance or resolution approved to such effects and by the

regulations adopted by virtue thereof." 21 L.P.R.A. § 4354. As such,

> all disbursements made by the municipality shall be made directly to the persons or
> entities that rendered the services or furnished the supplies or materials, except in
> those cases that there is a contract for the assignment of the credit and the regulatory
> requirements of the Commissioner have been met.

Id. at § 4354(d). The Municipality alleges that while the AMA recognizes the assignment of

credits, they must follow the notice requirements set forth in Regulation No. 8873. ECF No. 146,

at 14.

Under Regulation No. 8873, a municipality may issue payment in favor of a non-supplier

"only when the amounts to be paid by the municipality are assigned or transferred through a

contract executed before a Notary Public or any other official authorized to effect or recognize

deeds and certificates." See ECF No. 146-2, at 4-6 (Regulation No. 8873, Chapter IV, Section

10, paragraph 8). The assignment contract shall contain: (1) complete names and addresses for

the assignor and assignee; (2) effective date of the assignment contract; (3) number and amount

of the purchase order or contract services that give rise to assignment; and (4) indicate whether

the assignment is total or partial. If it is partial, it will provide the amount subject to assignment.

Id. The Municipality argues that the Notice of Assignment is invalid because it was not executed

before a notary public. ECF No. 146, at 14.

Xynergy, on the other hand, refutes the applicability of Regulation No. 8873 by pointing out that Regulation No. 8873 expressly sets forth the following: "[t]his Regulation applies to all Puerto Rico municipalities . . . except for those provisions that clearly state otherwise. However, it shall not apply in cases where a special law contains provisions that are contrary to those specified therein." ECF No. 151, at 4; ECF No. 44-1, at 2-3 (Regulation No. 8873, Chapter I, Section 4).[7] It is alleged by Xynergy that Chapter 9 is a special law that regulates "the enforcement and validity of an assignment of credits under Chapter 9, which also promulgates the proper form and requirements for notices of assignment, on its own terms." ECF No. 151, at 4-5.

"[A]cording to the general rules of construction of statutes [in Puerto Rico], a special law governing a specific matter prevails over a general law." See Cordova & Simonpietri v. Crown American, 12 P.R. Offic. Trans. 1003, 1007 (P.R. 1982). In the case at hand, Chapter 9 of Puerto Rico's Commercial Transactions Act is a special law that applies to transactions that create a security interest in a sale of accounts. See 19 L.P.R.A. 2219(a); In re Allied Financial, Inc., 616 B.R. 1, 5-6 (Bankr. D.P.R. 2020) ("the Commercial Transactions Act is a special law that governs negotiable instruments and it prevails over a general law"); In Re Manuel Mediavilla, Inc., 505 B.R. 94, 104 (Bankr. D.P.R. 2014) (noting that the Commercial Transactions Act is a special commercial law). "In matters which are the subject of special laws, any deficiency in such law is supplemented by the Puerto Rico Civil Code. As such, the Puerto Rico Civil Code acts as a supplement to the Commercial Transactions Act in areas where this statute is deficient." In re Allied Financial, Inc., 616 B.R. at 5-6.

---

[7] Regulation No. 8873, Chapter 1, Section 4 has not been tendered as an exhibit for this motion for summary judgment. However, no party is disputing the accuracy of the certified translations of portions of Regulation No. 8873 that were submitted as exhibits on a motion to dismiss. See ECF Nos. 33-1; 44-1.

Chapter 9 sets forth the specific requirements for an authenticated notification to be effective to inform an account debtor that the amount due has been assigned. See 19 L.P.R.A. § 2306(a). The authenticated notification must indicate that (1) "that the amount due or to become due has been assigned" and (2) "that payment is to be made to the assignee." Id. at § 2306(a). Thus, because Chapter 9 provides the specific requirements for an authenticated notification, there is no deficiency that needs to be supplemented. The Municipality contends that even if Chapter 9 is a special law, the public notary requirement in Regulation No. 8873 is not onerous and does not impose a burden or constitute an obstacle. ECF No. 146, at 15. However, Regulation No. 8873 does impose contrary notice requirements because the public notary requirement is absent from Chapter 9. Compare ECF No. 146-2, at 4-6 (Regulation No. 8873, Chapter IV, Section 10, paragraph 8), with 19 L.P.R.A. § 2306(a).

In the case at hand, the Notice of Assignment is an effective authenticated notification because it complied with Chapter 9's notice provisions. The AMA and Regulation No. 8873's notice requirements do not apply to the Master Agreement because Chapter 9 is a special law that applies to these transactions and Regulation No. 8873 has contrary notice provisions. Furthermore, Chapter 9 also specifically provides that "[t]he provisions of the Civil Code of Puerto Rico with respect to pledges and transmissions of credits shall not apply to transactions governed by this chapter." 19 L.P.R.A. § 2219(e).

Even assuming arguendo that Regulation No. 8873 did apply to the Master Agreement, the Municipality's argument that the Notice of Assignment is ineffective is undercut at this juncture by Xynergy's contention that after the Municipality received the Notice of Assignment, in relation to the services rendered by Geodata to the Municipality, the Municipality paid to the order of both Geodata and Xynergy the amount of $18,668,682.62. ECF No. 151-2, at 3, ¶ 8. See

Rosemount Global Trade v. AJC Int'l, Inc., Civ. No. 11-112, 2011 WL 13217820, at *4 (N.D.

Ga. Oct. 25, 2011) (explaining that "[s]tandard contract law would prevent [an account debtor]

from challenging the notification of the assignment's sufficiency once it has accepted the

notification and in particular, after it has made several payments."); Florida First Nat. Bank v.

Fryd Constr. Corp., 245 So. 2d 883, 886 (Fla. Ct. App. 1971) ("Having agreed by his actions as

to the binding effect of the notice he may not at this date disavow the notice and label his own

actions as illegal."); 4 White & Summers, Uniform Commercial Code, § 34-14 (6th ed. 2019)

("even if the notice is insufficient by objective standards, if the account debtor acts as if due

notification has been made, as by accepting the notification and making several payments to the

assignee, the account debtor will be estopped from asserting the insufficiency of the

notification.").

### D. Whether the Notice of Assignment Contemplated All of the Contracts Between the Municipality and Geodata

The Municipality alleges that even if the Notice of Assignment was deemed effective,

then it could only affect the contract that was in full force on February 20, 2014. ECF No. 146, at

17. The Municipality argues that at the time it received the Notice of Assignment on February

20, 2014, contract number 2014-001545 was in effect. ECF No. 146-11; ECF No. 146-4, at 3,

¶ 6. Contract number 2014-001545 was terminated on April 22, 2014. ECF No. 146-4, at 3, ¶ 7.

Thus, the Municipality claims that it is not obligated to pay Xynergy any monies except for those

invoices arising under contract number 2014-001545 because the Disputed Invoices arose under

different contracts and it never received any notices of assignment regarding the subsequent

contracts. ECF No. 146, at 17-18.

Through the Notice of Assignment, Geodata informed the Municipality that it had assigned its present and future accounts receivable to Xynergy and instructed the Municipality to remit all payments for all of its accounts receivable to Xynergy until notified otherwise by Xynergy only. ECF No. 146-11. The Notice of Assignment does not reference any contract number. Id. The Notice of Assignment also does not qualify that it only applied to the contract that was currently in effect between Geodata and the Municipality. Id. The Notice of Assignment simply provides that Geodata "assigned its present and future accounts receivable to [Xynergy]" and instructed the Municipality to "remit all payments for all accounts receivable from Geodata payable to [Xynergy]." Id. Therefore, even if Geodata and the Municipality entered into new contracts, the Notice of Assignment was still effective because it was for its present and future accounts receivable to Xynergy. Id.

Furthermore, "[o]nce an account debtor has notice of an assignment, if it has any questions, standard Uniform Commercial Code principles require the account debtor to contact the assignee for clarification. It cannot simply stop paying the assignee without asking." Rosemount Global Trade Finance Fund, L.P. v. AJC International, Inc., Civ. No. 11-112, 2011 WL 13217820, at *5 (N.D. Ga. Oct. 25, 2011); Greenfield Commercial Credit, L.L.C. v. Catlettsburg Refining, L.L.C., Civ. No. 3-3391, 2007 WL 97068, at *3 (E.D. La. Jan. 9, 2007) ("when an account debtor . . . doubts the adequacy of the notice of assignment, the onus is on it to contact the assignee—not the assignor—concerning the alleged insufficiency of the notice."); King v. Tuxedo Enterprises, Inc., 975 F. Supp. 448, 453 (E.D.N.Y. 1997) ("If the account debtor doubts the adequacy of the notification or the validity of the assignment, he or she may not disregard the notice, but must request the assignee to furnish reasonable proof that the assignment has been made."). In the case at hand, no evidence has been presented that the

21

Municipality, the account debtor, asked Xynergy, the assignee, for clarification regarding which accounts were assigned under the Notice of Assignment. If the Municipality had any doubts about the meaning of "present and future accounts" in the Notice of Assignment, it had the obligation to contact Xynergy regarding the scope of the assignment. No further inquiry was made by the Municipality and that failure is fatal to its contention that the Notice of Assignment only applied to the contract that was in full force on February 20, 2014. See Greenfield Commercial Credit, L.L.C, 2007 WL 97068 at *3.

The Municipality's argument is further undercut given that the Municipality paid Invoice 001-2017-Cont to the order of both Geodata and Xynergy which was governed by contract number 2017-000399B. ECF No. 146-1, at 6, ¶¶ 17, 18; ECF No. 151-1, at 2, ¶¶ 17, 18; ECF No. 146-4, at 7, ¶ 25.

### E. Whether the Municipality is Obligated to Pay the Disputed Invoices to Xynergy Because Xynergy is Not Mentioned in the Contracts between the Municipality and Geodata

Next, the Municipality claims that Xynergy is not entitled to payment on the invoices because Xynergy is not a party to the contracts between Geodata and the Municipality. ECF No. 146, at 19-20. It is further alleged by the Municipality that Xynergy is not entitled to payment on the invoices as a third-party beneficiary because the contracts between Geodata and the Municipality did not intend to confer a benefit upon Xynergy. Id. The Municipality argues that "a party outside the contractual relationship may demand performance of a contract only if the contract contains a stipulation in its favor." Id. at 19.

The Municipality's argument confuses the issue. It is irrelevant for purposes of the pending motion at hand whether the contracts between Geodata and the Municipality mandate payment on the invoices to Xynergy. Furthermore, Xynergy is not claiming it is entitled to

payment on the Disputed Invoices due to third-party beneficiary status. Instead, the focus should

be placed on the fact that under the Notice of Assignment, the Municipality, as an account

debtor, was required to pay the amounts due on the Disputed Invoices to Xynergy, as the secured

party. ECF No. 146-11; see 19 L.P.R.A. § 2306(a).

### F. Whether the Municipality is a Third Party Obligor of Governmental Accounts

The Municipality alleges that it was not required to pay the Disputed Invoices to Xynergy

according to the terms of the Master Agreement. Instead, the Municipality argues that it was

obligated to pay the Disputed Invoices to Geodata under the Master Agreement due to its alleged

status as a Third Party Obligor of Governmental Accounts. ECF No. 146, at 21. Xynergy, on the

other hand, contends that the Disputed Invoices were Non-Governmental Accounts. ECF No.

151-1, at 3, ¶ 26.

The Master Agreement outlined separate payments procedures for Governmental

Accounts and Non-Government Accounts. Under the Master Agreement, Third Party Obligors of

Governmental Accounts were obligated to pay the amounts due on the purchased accounts to

Geodata.  ECF No. 146-9, at 4, ¶ 4.3. Meanwhile, Third Party Obligors of Non-Governmental

Accounts were obligated to pay the amounts due on the purchased accounts to Xynergy. Id. at 4,

¶ 4.2. Therefore, the issue is whether the Disputed Invoices were Governmental or Non-

Governmental Accounts. The Master Agreement provides

> Accounts for which the Third Party Obligor is the United States of America or any
> state or any agency or Instrumentality thereof or any state which is obligated to
> make any payments with respect to Medicare or Medicaid Accounts or representing
> amounts owing under any other program established by a federal or state law which
> provides for payments for healthcare goods or services to be made to the Provider
> are hereinafter referred to as "Governmental Accounts"; all other Accounts are
> sometimes hereinafter referred to as "Non-Governmental Accounts."

ECF No. 146-9, at 1, ¶ 1.

The Municipality argues it is a Third Party Obligor of Governmental Accounts because it is an instrumentality of the Commonwealth of Puerto Rico and Geodata "is being paid with monies that come from the payments made by Medicare, Medicaid, other healthcare insurance companies, the local plan "Mi Salud", among other sources." ECF No. 146, at 21-22. Xynergy argues that the accounts it purchased from Geodata were Non-Governmental Accounts because they did not come directly from Medicare or Medicaid Accounts or amounts established by a federal or state law. ECF No. 151, at 13.

In the case at hand, the accounts receivable being purchased by Xynergy pursuant to the Master Agreement were not amounts owed to Geodata for Medicare or Medicaid Accounts. The accounts receivable were also not amounts owed to Geodata under a program established by a federal or state law which provides for payments for healthcare goods and services. Instead, the accounts receivable that Xynergy purchased from Geodata were "invoices for the administrative services of billing, collections, and ancillary matters" that Geodata provided to the Municipality. ECF No. 151-2, at 5, ¶ 14; ECF No. 146-9, at 1. The particular services contemplated by the contracts between Geodata and the Municipality were not paid from federal funds, but rather from the Municipality's ordinary funds. ECF No. 146-6, at 22, ¶¶ 5.3.2.6 and 5.4. The mere fact that the Municipality is an instrumentality of the Commonwealth of Puerto Rico and receives monies from Medicare or Medicaid does not mean the Disputed Invoices are Governmental Accounts under the Master Agreement. Therefore, the Municipality's argument that the Disputed Invoices are Governmental Accounts is unsustainable. The Municipality was obligated to make payments on the Disputed Invoices to Xynergy.

24

### G. Whether the Payment of the Disputed Invoices to Geodata Relieved the Municipality's Obligation to Pay Xynergy

The Municipality argues it is not required to pay the amount of the Disputed Invoices to Xynergy because it already paid the amount of the Disputed Invoices to Geodata on the instructions of Geodata. ECF No. 146, at 23. The Municipality alleges that "Xynergy can't by itself have any input on how the Municipality disbursed its obligations with [Geodata]" and "it was [Geodata] who instructed the [Municipality] to stop making such payments. Why would the [Municipality] question said instructions from its provider?" Id. at 24.

As stated earlier, Chapter 9 establishes that "an account debtor on an account . . . may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee." 19 L.P.R.A. § 2306(a). After an account debtor has received an authenticated notification, "the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." Id.

Thus, it follows that after the Municipality received the Notice of Assignment on February 20, 2014, it could only discharge its obligations by paying Xynergy. See ARA Inc. v. City of Glendale, 360 F. Supp. 957, 967 (D. Ariz. 2019) ("Generally, an account debtor who disregards directions to pay the assignee and instead pays the assignor remains liable to the assignee."); Durham Commercial Capital Corp. v. Owen Loan Servicing, LLC, Civ. No. 15-80200, 2015 WL 4164780, at *4 (S.D. Fla. 2015) (citations omitted) ("a debtor who receives actual notice of the assignment of an account receivable or an obligation to pay may be held liable to the assignee if the debtor later pays the assigned debt to the assignor rather than the

25

assignee."); Pacific Bus. Capital Corp. v. Time Warner Cable, LLC, Civ. No. 9-5188, 2012 WL 2970490, at *2 (C.D. Cal. July 20, 2012) ("an account debtor who ignores the notification of assignment and continues to pay the assignor is not relieved of its obligation to pay the assignee and will be subject to liability to the assignee for any payments made to the assignor."); Greenfield Commercial Credit, L.L.C. v. Catlettsburg Refining, L.L.C., Civ. No. 3-3391, 2007 WL 97068, at *3 (E.D. La. Jan. 9, 2007) ("It is well established that an account debtor who fails to comply with a valid assignment and improperly pays the assignor may be liable to the assignee for the amount of the improper payment.").

**H. Whether the Case Should be Dismissed Against the Municipality Due to the Existence of a Hold-Harmless Agreement**

Lastly, the Municipality argues that the case should be dismissed because there is a hold-harmless clause in the contract between the Municipality and Geodata. ECF No. 146, at 24. Xynergy, on the other hand, contends that the hold-harmless clause is a contractual provision in the contract between the Municipality and Geodata, and that it cannot bar third party claims against the party to be indemnified. ECF No. 151, at 14-15.

"A hold-harmless agreement is one in which one party assumes all or part of the liability inherent in a situation, thereby relieving the other party of responsibility." Lopez v. Nutrimix Feed Co., Inc., 27 F. Supp. 2d 292, 300 (D.P.R. 1998). "The general rule is that parties may freely negotiate hold harmless clauses so long as such agreements are not in violation of the law." Id. The duty to defend and indemnify may be triggered at the time the claim is made against the beneficiary of the hold-harmless agreement. See Sterling v. Aerostar Airport Holdings, LLC, Civ. No. 14-1180, 2015 WL 4609981, at *6-7 (D.P.R. July 31, 2015). The contract between the Municipality and Geodata states that Geodata

releases the MUNICIPALITY of all liability with regard to any claim, lawsuit, complaint, lawsuit or denunciation that is filed related to the services object of this Contract by third parties, including agents, representatives, employees or officers of both parties. This exoneration and release will be interpreted in the most reasonable manner possible for the MUNICIPALITY, including the release of the payment of judgment, penalty, fine, interests or transaction,, as well as the expenses of litigation, fees, costs and attorney expenses. THE MUNICIPALITY will not have any direct or indirect responsibility for any loss or damage that may be suffered by any natural or juridical person for the services or operations that arise from this Contract, regardless of whether it can be alleged that the MUNICIPALITY is responsible for the same.

ECF No. 146-6, at 35, ¶ 7.11. The contract proceeds to state that Geodata "agrees and obligate[s] itself absolutely to protect, defend, indemnify and maintain THE MUNICIPALITY, its employees and its agents, at all time free and clear of damages, prejudice and responsibility of any kind and nature, for and against any claim." Id. at 35, ¶ 7.12.

The Municipality's argument that dismissal of this case is warranted due to the existence of a hold-harmless clause in a contract between Geodata and the Municipality is unfounded. ECF No. 146, at 24-25. "It has been well established that a contract can only bind the contracting parties." Casiano Melendez v. Municipality of San Juan, Civ. No. 13–1843, 2014 WL 6983399, at *4 (D.P.R. Dec. 10, 2014); 31 L.P.R.A. § 3374 ("Contracts shall only be valid between the parties who execute them and their heirs ..."); In Re Arterburn, 15 B.R. 189, 191 (Bankr. W.D. Okla. 1981) ("litigation over hold-harmless agreements is confined to the parties to the agreement."). Xynergy was not a party to the contract between Geodata and the Municipality, and thus, the terms of that contract cannot be enforced against Xynergy. See Dantlzer, Inc. v. Lamas-Besos, Civ. No. 10-1004, 2010 WL 2572618, at *3 (D.P.R. June 22, 2010) ("[i]n Puerto Rico, contracts are generally only valid between the parties who execute them, and actions arising out of a contract can be prosecuted only by one contracting party against the other.").

A hold-harmless clause in a contract does not bar third-party claims against the party to be indemnified. The mere fact that Geodata agreed to release and indemnify the Municipality of any claim related to the services stemming from their contractual relationship does not prohibit Xynergy from seeking a declaratory judgment against the Municipality for its failure to discharge its payment obligations pursuant to the assignment and Chapter 9 of the Commercial Transactions Act. The proper course of action is for the Municipality to enforce the hold-harmless provision in the contract against its contractual partner, Geodata, and seek indemnification from said entity.

## V.     Conclusion

For the foregoing reasons, the Municipality's motion for summary judgment against Xynergy (ECF No. 146) is DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 29th day of January, 2021.

s/Marcos E. López
U.S. Magistrate Judge